**Bhimavarapu K. REDDY, Plaintiff,**

v.

**GOOD SAMARITAN HOSPITAL AND HEALTH CENTER, et al., Defendants.**

No. C–3–90–197.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 19, 2000.

Alan C. Witten, McShane Breitfeller & Witten, Louis A. Jacobs, Ralph E. Breitfeller, Columbus, OH, for Plaintiff.

Robert J. Brown, Sue K. McDonnell, Dayton, OH, John L. Green, Dinsmore & Shohl, Susan E. Wheatley, Taft Stettinius & Hollister, Cincinnati, OH, Roger J. Makley, Dayton, OH, for Defendants.

EXPANDED OPINION SETTING FORTH REASONING AND CITATIONS OF AUTHORITY IN SUPPORT OF COURT'S ORDER OF SEPTEMBER 24, 1994 (DOC. # 153), WHICH SUSTAINED THE MOTION OF DEFENDANT GOOD SAMARITAN HOSPITAL AND HEALTH CENTER FOR SUMMARY JUDGMENT (DOC. # 112), WHICH SUSTAINED IN PART AND OVERRULED IN PART THE MOTION OF DEFENDANT ANESTHESIA ASSOCIATES OF NORTHWEST DAYTON, INC., FOR SUMMARY JUDGMENT (DOC. # 118), AND WHICH SUSTAINED THE MOTION OF DEFENDANT ANESTHESIA ASSOCIATES OF DAYTON, INC., FOR SUMMARY JUDGMENT (DOC. # 120); EXPANDED OPINION SETTING FORTH REASONING AND CITATIONS OF AUTHORITY IN SUPPORT OF COURT'S ORDER OF FEBRUARY 6, 1995 (DOC. # 154), WHICH SUSTAINED IN PART AND OVERRULED IN PART THE MOTION OF DEFENDANT ANESTHESIA ASSOCIATES OF NORTHWEST DAYTON, INC., TO STRIKE (DOC. # 139); JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFF; TERMINATION ENTRY.

RICE, Chief Judge.

In 1973, Plaintiff Bhimavarapu K. Reddy ("Reddy") was hired as an anesthesiologist by one of the Defendants, Anesthesia Associates of Dayton, Inc. ("AA/Dayton").[1]

---

1. The following facts are undisputed, and are taken from the parties' memoranda submitted in support of and in opposition to the motions for summary judgment. In his memorandum in opposition to Defendants' motions for summary judgment (Doc. # 125), Plaintiff provides a highly detailed rendition of the factual background. In fact, it consumes 165 typewritten pages. Although the factual back-

He was employed by AA/Dayton for one year. Thereafter, Plaintiff became both a shareholder and an employee of AA/Dayton, a status he continued to maintain until 1988. As both an employee and a shareholder of that corporation, Reddy's practice of anesthesiology was centered at Defendant Good Samaritan Hospital and Health Center ("Good Samaritan").[2] At some point, disputes regarding compensation and referrals arose between Plaintiff and the other shareholders of AA/Dayton who practiced at that facility. Therefore, in 1987, Plaintiff began to explore leaving AA/Dayton and establishing his own group to practice anesthesiology at Good Samaritan. In March, 1988, Plaintiff told his fellow AA/Dayton shareholders of his intention to leave AA/Dayton, and in August of that year, his fellow shareholders asked him to leave the group. He did so and formed a sole proprietorship, B.K. Reddy and Associates, under which he continued to practice anesthesiology at Good Samaritan. At that time, both Plaintiff and AA/Dayton provided anesthesia services at that institution.

During the period that Plaintiff practiced at Good Samaritan under his sole proprietorship, changes were made in the manner in which anesthesiologists practiced at that hospital. For instance, the number of Certified Registered Nurse Anesthetists ("CRNA") which a physician could supervise was limited. In addition, the ability of a physician both to supervise a CRNA and to provide services himself or herself was curtailed.

Having two separate anesthesia groups providing services at Good Samaritan was not successful. Consequently, the hospital's administration decided to enter into an exclusive contract for the provision of anesthesia services. Initially, Good Samaritan negotiated with Drs. Thomas and Seitzman. Although these two anesthesiologists were both shareholders of AA/Dayton, they formed there own corporation, RTHS, Inc. ("RTHS"), for the purpose of entering into the exclusive contract. In other words, Thomas and Seitzman negotiated the exclusive contract for themselves and not on behalf of AA/Dayton. In early 1990, K. Douglas Deck ("Deck"), Good Samaritan's President and CEO,[3] announced that the hospital had entered into an exclusive contract with RTHS. However, that decision was not favorably received. As a consequence, the exclusive contract between the hospital and RTHS was not consummated. Good Samaritan's Board of Trustees then told Deck to work with the anesthesiologists on staff to form a new corporation, which would be given an exclusive contract to provide anesthesia services at the hospital. Deck met with those anesthesiologists and told them that the hospital would enter into an exclusive contract with a newly formed corporation, and that all anesthesiologists would be permitted to participate equally in that corporation. Deck was adamant that the hospital would not contract with any of the existing groups providing services (i.e., AA/Dayton, Plaintiff, or RTHS).[4]

ground set forth by the Court does not even scratch the surface of that recited by Plaintiff, additional material facts will be set forth during the analysis of Reddy's claims, and they will be construed in the light most favorable to Plaintiff, the party against whom the motions for summary judgment are directed.

**2.** Collectively, employees and shareholders of AA/Dayton practiced at both Good Samaritan and Miami Valley Hospital. However, an in-

dividual anesthesiologist would center his or her practice, almost exclusively, at one hospital or the other.

**3.** Deck became the CEO of Good Samaritan in September of 1987 (Deck. June 12, 1992 Dep. at 26–27). Prior to that time, he held the position of Chief Operating Officer at Good Samaritan.

**4.** See Deck June 12, 1992 Dep. at 87–90.

As a result, a new corporation, Anesthesia Associates of Northwest Dayton, Inc. ("AA/Northwest"), was formed in March, 1990, for the purpose of negotiating a contract.

AA/Northwest offered contracts to all anesthesiologists on staff, including Plaintiff.[5] Plaintiff refused to join the new corporation. Rather, he initiated this litigation, on May 23, 1990, seeking to enjoin the exclusive contract, alleging that it violated 42 U.S.C. § 1981. When this Court denied Reddy's request for a preliminary injunction, the offer to Plaintiff was renewed. It was ultimately extended until June 29, 1990. On that date, Reddy attempted to join the new group; however, his effort was either too late or the offer was withdrawn.

In July, 1990, Plaintiff attempted to have his privileges at Miami Valley Hospital ("Miami Valley") upgraded from courtesy to active status.[6] Although this process took longer than he thought it should have, in November, 1990, Reddy was granted active privileges at Miami Valley.[7] However, before he was granted such privileges, Miami Valley entered into a letter of intent to enter into an exclusive contract with AA/Dayton. Although at one time he had been both an employee and shareholder of that organization, Reddy never requested that he again become a member or employee of that corporation.

In his Second Amended Complaint (Doc. # 43) Plaintiff sets forth six claims against Good Samaritan, AA/Northwest and AA/Dayton, to wit: a claim of discrimination, in violation of § 1981 (First Claim for Relief); a claim of restraint of trade, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and Ohio's Valentine Act, Chapter 1331 of the Ohio Revised Code (Second and Third Claims for Relief); a state law claim of tortious interference with prospective contractual relationship (Fourth Claim for Relief); a state law claim of breach of contract (Fifth Claim for Relief); and a claim of retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Chapter 4112 of the Ohio Revised Code (Sixth Claim for Relief).[8]

After extensive discovery, the three Defendants filed Motions for Summary Judgment, to wit: Good Samaritan (Doc. # 112), AA/Northwest (Doc. # 118) and AA/Dayton (Doc. # 120). On September 24, 1994, this Court entered an Order in which it sustained the Motions for Summary Judgment of Good Samaritan and AA/Dayton, as well as sustaining in part and overruling in part that filed by AA/Northwest (Doc. # 153). On February 6, 1995, the Court entered an Order (Doc. # 154), which sustained in part and overruled in part the Motion of AA/Northwest to Strike the Affidavits of Engel and Spirtos (Doc. # 139). The Court now sets forth, in this expanded opinion, the reasoning and citations of authority which support those two Orders. As a means of

5. Reddy has acknowledged that he was offered the opportunity to become a shareholder in AA/Northwest on the same terms as the other anesthesiologists.

6. The difference between the two types of privileges is that a physician with courtesy privileges can treat only a limited number of patients at the hospital in a particular year.

7. The reason the process took so long is that Reddy failed to obtain the requisite letters of reference. Among those letters he attempted to secure was one from Dr. Alfred Jenkins, an African American, who was President of AA/Northwest. During his deposition, Jenkins testified that he refused to respond to the request because, when it was made, AA/Northwest was a party to this litigation.

8. Plaintiff asserts his breach of contract claim against only Good Samaritan. His other claims are pled against all three Defendants.

analysis, the Court will initially address the Motion to Strike, and then turn to the three Motions for Summary Judgment, first setting forth the standard which must be applied to every such motion, following which it will address the arguments that the parties have presented in support of and in opposition to the three motions filed in this litigation, discussing Reddy's claims in the order presented above.[9]

I. *Motion to Strike of AA/Northwest (Doc. # 139)*

Fed.R.Civ.P. 56(e) sets forth three requirements for affidavits which are used in support of or in opposition to a motion for summary judgment. It provides that those affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." These requirements are mandatory. Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738 (2d ed.1983); *Collazos–Cruz v. United States*, 117 F.3d 1420, 1997 WL 377037 (6th Cir.1997). "An affidavit that does not satisfy the requirements of Rule 56(e) is subject to a motion to strike." *Collazos–Cruz*, 117 F.3d 1420, 1997 WL 377037 at *2, citing *Noblett v. General Elec. Credit Corp.*, 400 F.2d 442, 445 (10th Cir.), *cert. denied*, 393 U.S. 935, 89 S.Ct. 295, 21 L.Ed.2d 271 (1968).

AA/Northwest seeks to strike, in their entirety, the affidavits of Ronald C. Engel and Gary N. Spirtos, which were offered by Plaintiff in his Memorandum in Opposition to Defendants' Motions for Summary Judgment. The crux of AA/Northwest's motion is that the matters set forth in those affidavits are not based upon personal knowledge and contain inadmissible speculation, accusations and hearsay (thus implicating two of the three criteria set forth in Rule 56(e)).[10] In particular, AA/Northwest argues that the affidavits lack the requisite factual support for a finding of personal knowledge of the matters to which they attest. Defendant[11] states that the affidavits deliberately omit information, thus misleading the reader and, which would, in the case of Engel's affidavit, indicate that he could not have had personal knowledge of the events. Moreover, Defendant asserts that the declarant's statement that the facts contained in their affidavits are "to the best of his recollection and belief" is insufficient to satisfy the personal knowledge requirement of Rule 56(e). In addition, AA/Northwest asserts that certain paragraphs contain hearsay and conclusory statements based thereon.

Plaintiff has responded that AA/Northwest's Motion must be denied for four reasons, to wit: 1) Rule 12(f), a basis for Defendant's motion, has been improperly

9. Although federal courts have the discretion to dismiss pendent state claims after granting summary judgment on the federal claims, the Court considers that it would be an abuse of that discretion to dismiss those claims in this case. This litigation has been pending for many years, and the parties have engaged in extensive discovery. Moreover, this Court has familiarity with the issues (factual as well as legal) presented in this litigation, by virtue of ruling on the instant motions and conducting the hearing on Plaintiff's motion for a preliminary injunction. Therefore, even if the Court concludes that Defendants are entitled

to summary judgment on all of Plaintiff's federal claims, the Court will also address the merits of the state law claims. In other words, the Court will continue to exercise supplemental jurisdiction over those claims.

10. There is no indication that AA/Northwest is challenging the witnesses' competency to testify to the matters contained in their affidavits.

11. For purposes of resolving the motion to strike, the term Defendant will be used to refer only to AA/Northwest.

invoked; 2) the affidavits satisfy the personal knowledge requirement of Fed. R.Evid. 602; 3) the affidavits satisfy the oath or affirmation requirement of Fed. R.Evid. 603; and 4) statements by the affiants that could be construed as opinions or inferences satisfy the lay opinion standard of Fed.R.Evid. 701. The Court now addresses these arguments, discussing first the basis for Defendant's Motion and then the requirements of Rule 56(e) which have been called into question.[12]

### 1. Basis for Defendant's Motion

Plaintiff argues that Defendant's Motion must be denied, because it was improperly raised under Fed.R.Civ.P. 12(f). Although Plaintiff is correct that Rule 12(f) concerns only pleadings (i.e. complaints, answers, replies to claims asserted therein), *Ernst Seidelman Corp. v. Mollison,* 10 F.R.D. 426, 427 (S.D.Ohio 1950), AA/Northwest has also raised its motion pursuant to Fed. R.Civ.P. 56(e), quoted above, which provides a basis for a motion to strike. *E.g., Collazos Cruz, supra.* Thus, Defendant has properly brought its Motion to Strike.

### 2. Omitted Facts

AA/Northwest objects to the affidavits of Engel and Spirtos on the ground that they fail to include material facts, the failure of which results in misleading the reader. It claims, for example, that Dr. Spirtos' affidavit identifies him as a foreign medical school graduate ("FMG"), but fails to indicate his national origin (American), because that fact contradicts Plaintiff's thesis that FMG is a code for foreign-born. Similarly, it argues that CRNA Engel's affidavit fails to indicate the precise date that he was hired by AA/Northwest,

because the date would indicate that he was not in a position to offer the opinions that he rendered regarding the exclusive contract between AA/Northwest and Good Samaritan. Plaintiff responds that credibility determinations have no place in summary judgment determinations, and that the extent of the witness' knowledge of matters to which he attests goes to the weight of the testimony and not to its admissibility. Reddy's fourth argument is applicable to this concern.

■ AA/Northwest's principal argument is that the affidavits omitted information which would show the weaknesses in Reddy's "theory of the case." In essence, Defendant calls the Court's attention to Plaintiff's failure to include information which would diminish the credibility of his witnesses. However, were this case were to go to trial, Defendant would have an opportunity to demonstrate those weaknesses through cross-examination of the witnesses. For instance, during cross-examination, AA/Northwest could point out the fact that Dr. Spirtos is American-born. Similarly, it could draw attention to the gap in time between the entering of the exclusive contract between AA/Northwest and Good Samaritan and the employment of Engel by Defendant, and question the basis for Engel's opinions about the formation and consequences of that contract. Because Defendant's argument goes to the credibility of affiants Engel and Spirtos, Defendant's Motion to Strike is OVERRULED as to that ground.

### 3. Personal Knowledge Requirement

As stated above, Rule 56(e) requires that all affidavits submitted in support of

---

**12.** AA/Northwest states that Plaintiff's third argument addresses a concern that it did not raise. Based on that statement, the Court construes Defendant's Motion as not raising a challenge to Engel's and Spirtos' affidavits for failing to satisfy the oath or affirmation requirement of Fed.R.Evid. 603. Accordingly, the Court will not address Plaintiff's third argument.

or in opposition to motions for summary judgment include facts based on personal knowledge. Fed.R.Civ.P. 56(e). Plaintiff argues that the two affidavits satisfy the personal knowledge requirement of Fed. R.Evid. 602. He argues that "recollection and belief" is sufficient to state that statements in affidavit were based upon personal knowledge, and that the facts contained in the affidavits indicate that the beliefs are based upon such knowledge. In essence, Reddy asserts that, in the context of the two challenged affidavits, "belief" refers to the lay opinion facts stated therein, which were based on personal knowledge.

■ Under Rule 56(e), it must be evident from the affidavit that the facts contained therein are based on personal knowledge. *E.g., Allen v. International Tel. & Tel. Corp.,* 164 F.R.D. 489, 492 (D.Ariz.1995), *aff'd,* 111 F.3d 137, 1997 WL 168340 (9th Cir.1997). Although the affidavit, ideally, will expressly state the basis for the facts, in some instances, personal knowledge may be inferred from the content of the statements. 11 James Wm. Moore. et al., *Moore's Federal Practice* § 56.14[1][c] (3d ed. 1999) ("For example, family members are presumed to have personal knowledge of a family member's possession of land. In the same manner, corporate officers are presumed to have personal knowledge of acts of their corporation."). "Personal knowledge may also flow logically from the context of the affidavit." *Id.* However, statements made "on information and belief" are insufficient to satisfy the personal knowledge requirement of Rule 56(e). *E.g., Automatic Radio Mfg. Co. v. Hazeltine Research,* 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312 (1950) (affidavit in support of motion for summary judgment made on information and belief does not comport with Rule 56(e)); *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639 (2d Cir.1988); *Tavery v. United States,* 32 F.3d 1423, 1426 n. 4 (10th Cir.1994); *Jameson v. Jameson,* 176 F.2d 58, 60 (D.C.Cir.1949) ("Belief, no matter how sincere, is not equivalent to knowledge."); *Wilson v. Bernalillo,* 211 F.3d 1279, 2000 WL 485129 (10th Cir.2000); *Rice v. United States,* 1997 WL 792342 (D.N.M. July 2, 1997); 10B Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2738.

■ The affidavits of Engel and Spirtos each state that he, "having been first duly cautioned and sworn, swears that to the best of his *recollection and belief* the following facts are true." (emphasis added). Parsing the phrase "recollection and belief," the term "recollection" indicates that the information is based on personal knowledge. *See Bright v. Wal–Mart Stores, Inc.,* 1998 WL 160859 (N.D.Ill. Apr.6, 1998) (refusing to strike affidavit based on "recollection"). On the other hand, the term "belief" fails to indicate the basis for the stated facts. *See Mitchell v. Toledo Hosp.,* 964 F.2d 577, 584–85 (6th Cir.1992). Together, the words "recollection and belief" do not equate to a declaration that all of the statements are based on personal knowledge. *Sellers,* 842 F.2d at 643 (striking, in its entirety, affidavit which was based upon "personal knowledge or upon information and belief," because there was no way to ascertain which portions were based upon personal knowledge as opposed to information and belief). However, even a casual reading of the affidavits at issue herein indicates that a number of the paragraphs are clearly based on personal knowledge. Accordingly, the Court will not strike Engel's and Spirtos' affidavits in their entirety. Rather, the Court will strike only those paragraphs for which it cannot ascertain that there is a personal knowledge basis for the facts contained therein.

Turning first to the affidavit of Ronald Engel, CRNA Engel's affidavit primarily describes his employment history with

AA/Dayton, B.K. Reddy and Associates, and AA/Northwest, and the changes and effects of various Department of Anesthesiology policies at Good Samaritan during the course of his employment. In general, the Court accepts that Engel has personal knowledge of his own employment history, and the rules by which he was to perform his job. Thus, the Court will address only AA/Northwest's specific challenges, and those paragraphs which do not support the conclusion that he had personal knowledge of the facts contained therein.

*First,* AA/Northwest challenges Engel's assertions about policy changes that were made at Good Samaritan after the exclusive contract was entered into between the hospital and AA/Northwest. It argues that, because the contract was negotiated in April, 1990, a period of time when Engel was not at Good Samaritan, he could not have personal knowledge of the policy changes that occurred at that time the exclusive contract was consummated. Engel was employed by AA/Dayton and B.K. Reddy and Associates prior to the exclusive contract, and by AA/Northwest subsequent to the effective date of the contract. Accordingly, it is apparent that he was in a position to know the differences between the policies of Good Samaritan's Department of Anesthesiology, prior to the exclusive contract and afterwards. Those paragraphs will not be stricken.

In paragraph 9, Engel states that Good Samaritan and AA/Dayton established rules that adversely affected the ability of B.K. Reddy and Associates to practice anesthesiology. Although it is likely that he had personal knowledge of the hospital policies that affected him as a CRNA working at Good Samaritan, the Court cannot similarly conclude that he had personal knowledge that it was AA/Dayton who established the rules, particularly in light of the fact that he refers to rule changes that occurred while he was em-

ployed by B.K. Reddy and Associates. Accordingly, the reference to AA/Dayton in paragraph 9 is stricken. Similarly, during the time period that Engel worked for B.K. Reddy, the Court cannot conclude that Engel had a basis to know of the effect of various hospital policies on AA/Dayton's practice. Thus, the entirety of paragraphs 13, 22, 26, and 35 must be stricken.

Engel's affidavit has not provided the Court with any ground to conclude that he had personal knowledge to support a number of the statements about the general state of affairs at Good Samaritan, to wit: that AA/Dayton was able to manipulate the creation and enforcement of rules (p.6, paragraph 37), about the rate of quality assurance problems and reviews or morbidity and mortality reviews (paragraphs 14, 49, 50), and Dr. Reddy's availability and skills compared to AA/Dayton, as well as reports made regarding his behavior (paragraphs 47, 48, 51, 52, 56). Engel also has not provided any basis for concluding the he had any personal knowledge of Good Samaritan's decision to have the ASA study performed and the timing of its disclosure (paragraph 44). Thus, those statements are ordered stricken.

In addition, there is no indication, from the affidavit, that Engel had personal knowledge of incidents which did not involve him personally. Engel has not indicated that he was present at the quality assurance meetings regarding Dr. Reddy (paragraphs 34 and 35, page 7; paragraph 90), or Dr. Ralson (paragraph 89). He also has not indicated that he witnessed Dr. King's behavior toward Dr. Reddy (paragraph 80). He also has provided no foundation to support that he had personal knowledge regarding the recruitment of physicians and nurses by B.K. Reddy; although an employee of that group, Engel has not provided a basis to conclude that

he was involved in efforts to recruit both a retired CRNA and Dr. Spirtos or what happened to Spirtos once he "came on board" (paragraphs 73–76, 82–83). Finally, Engel has provided no basis for the Court to conclude that he had personal knowledge of the December, 1990, Christmas party (paragraph 96). Accordingly, the above-mentioned paragraphs[13] must be stricken, on the ground that the affidavit has not provided the Court with a basis to conclude that Engel has personal knowledge of the events to which he attested therein.

As to the affidavit of Gary Spirtos, virtually every paragraph indicates that it is based on personal knowledge. With the exception of paragraphs 16, 38, 39, 45, 47, 48, and 60, Dr. Spirtos' affidavit contains his employment history, his thoughts regarding his employment choices and conditions, his conversations with other physicians, and his conduct. Based on the content of those paragraphs, Dr. Spirtos' personal knowledge is presumed.

It is not clear, however, that paragraphs 16, 38, 39, 45, 47, 48, and 60 are based on Dr. Spirtos' personal knowledge. Paragraphs 45, and 60 are conclusory and do not indicate the basis for those statements. Paragraph 16 fails to indicate his personal knowledge of the conditions of employment imposed on other anesthesiologists; that reference, therefore, must be stricken. There is no basis to conclude that Dr. Spirtos has personal knowledge of the frequency of Dr. Reddy's cases undergoing quality assurance reviews or morbidity and mortality reviews, as discussed in paragraphs 38 and 39; the fact that Dr. Spirtos worked for Dr. Reddy is insufficient to

support such an inference. Likewise, there is no basis to conclude that Spirtos had personal knowledge of the attempted recruitment of two Indian anesthesiologists by B.K. Reddy and Associates, as a stated in paragraphs 47 and 48; Dr. Spirtos' employment with B.K. Reddy does not imply knowledge of its recruitment efforts. Accordingly, paragraphs 38, 39, 45, 47, 48, and 60, and the above-referenced portion of paragraph 16 are ordered stricken from his affidavit.

### 4. *Admissibility Requirement*

In its Memorandum, Defendant disputes the admissibility of specific paragraphs in the affidavits of both Engel and Spirtos.[14] *See AT&T v. Shared Communication Servs.*, 1995 WL 555868, at *3 (E.D.Pa. Sept.14, 1995) ("Although AT & T asserts that the paragraphs it points to are only examples of the inadmissible nature of the entire Brown affidavit, it is AT & T's burden as the party moving to strike the affidavit to show the inadmissibility of each statement in the affidavit."); *Ernst Seidelman Corp.*, 10 F.R.D. at 428 ("The Court cannot and should not be expected to go through the Gardener affidavit 'with a fine-tooth comb' and pick out the 'certain portions' which the defendants (from their viewpoint) feel should be stricken. That duty and responsibility rests upon the defendants."); *Hodgson v. Holden Hosp., Inc.*, 1970 WL 748 (S.D.W.Va. Dec.14, 1970)(same). Of the remaining paragraphs in Engel's affidavit, AA/Northwest challenges the admissibility of one additional paragraph. It states that Engel is impermissibly providing an opinion of law when he stated that CRNAs need not be

---

**13.** To reiterate, the referenced paragraphs were 13, 14, 22, 26, 34–35(p.7), 37(p.6), 44, 47–52, 56, 73–76, 80, 82–83, 89–90, and 96, and a portion of paragraph 9.

**14.** Defendant addresses specific paragraphs in the body of its motion to strike. It also cites, in footnotes, several other paragraphs. Because AA/Northwest has not provided any argument in support of its request to strike the paragraphs cited in footnotes, the Court does not deem those paragraphs to be properly challenged and it will not address them.

supervised by physician anesthesiologists. Although that particular statement has little probative value in light of the substantive issues before the Court, Defendant's argument is correct and Plaintiff has not refuted it. That portion of paragraph 20 therefore is ordered stricken. As to Dr. Spirtos' affidavit, AA/Northwest contends that paragraphs 29 and 52 are based on inadmissible hearsay. The Court agrees that both his statement based on CRNA Bolton's statistics and his statement indicating what another Indian FMG told him constitute hearsay. Because Plaintiff has not asserted that those statements are covered by a hearsay exception, and the Court sees none that is applicable, those statements are also ordered stricken.

Accordingly, Defendant AA/Northwest's Motion to Strike is OVERRULED in PART and SUSTAINED in PART. With regard to Engel's affidavit, paragraphs 13, 14, 22, 26, 45, 46, 34–35(p.7), 37(p.6), 44, 47–52, 56, 73–76, 80, 82–83, 89–90, and 96, and a portion of paragraphs 9 and 20 are stricken. Paragraphs 29, 38, 39, 45, 47, 48, 52, and 60 of Spirtos' affidavit are also stricken. The Court will act in accordance with this ruling in addressing the three motions for summary judgment, to which it now turns.[15]

## II. Standard for Motions for Summary Judgment

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

---

15. Parenthetically, the Court notes, as a practical matter, that the striking of portions of the affidavits of Engel and Spirtos has minimal, if any, effect on the substance of the evidence before it. The substance of most of the stricken evidence appears in the deposition testimony of CRNA Bolton, whose testimony has not been challenged.

■ Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the

parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure*, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment....."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### III. Plaintiff's claims under § 1981 (First Claim for Relief)

42 U.S.C. § 1981 guarantees to "[a]ll persons ... the same right ... to make and enforce contracts...as is enjoyed by white citizens."[16] In *Patterson v. McLean*

---

**16.** In its entirety, 42 U.S.C. § 1981(a) provides:

 (a) Statement of equal rights
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evi-

dence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court applied the evidentiary framework developed in Title VII cases to claims brought under § 1981. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992). Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. The elements of a *prima facie* case under § 1981 are:

(1) the plaintiff is a member of a minority group;

(2) he or she was qualified for and sought a contract;

(3) he or she was not given the contract; and

(4) a non-minority was given that contract.

*Sandhu v. AAMCO Transmissions, Inc.,* 782 F.2d 1043, 1985 WL 14087 (6th Cir. 1985), *cert. denied,* 476 U.S. 1105, 106 S.Ct. 1950, 90 L.Ed.2d 359 (1986).

Once the plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for rejecting the plaintiff. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant offers a legitimate reason, the burden of production shifts back to the plaintiff to demonstrate that the defendant's reason is not real, but a pretext for discrimination. *Id.; McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. 1817. The plaintiff may meet this burden by showing: (1) that the stated reason had no basis in fact, (2) that the stated reason was not the actual reason, or (3) that the stated reason was insufficient to explain the defendant's action. *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994). The burden of persuasion, however, always remains with the plaintiff. *See Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

## A. Good Samaritan

Reddy's central § 1981 claim against Good Samaritan is that the hospital discriminated against him on the basis of his race and/or nationality (tan-skinned Indian) when it entered into an exclusive contract with AA/Northwest, thus denying him the opportunity to enter into the exclusive contract to provide anesthesia services at Good Samaritan.[17] Good Samaritan argues that it is entitled to summary

---

In *Patterson,* the Supreme Court held that § 1981 "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." 491 U.S. at 171, 109 S.Ct. 2363. In response to the *Patterson* decision, Congress enacted § 101 of the Civil Rights Act of 1991, which provides that " § 1981's prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship, including discriminatory contract terminations." *Rivers v. Roadway Exp., Inc.,* 511 U.S. 298, 302, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). However, the Supreme Court has held that § 101 does not apply retroactively. *Id.* at 313, 114 S.Ct. 1510. Because

the conduct at issue occurred prior to the enactment of § 101, the Court must interpret § 1981 as set forth by the Supreme Court in *Patterson.*

17. Plaintiff does not claim that Good Samaritan violated § 1981 when it entered into the abortive contract with Drs. Thomas and Seitzman. Indeed, such a claim would be unavailing, because that contract was not consummated (*i.e.,* Drs. Thomas and Seitzman and their corporation were never the exclusive providers of anesthesia services). Therefore, the entering into that contract, even if it violated § 1981, could not have been the proximate cause of any damages Plaintiff claims to have suffered as a result.

judgment on this claim, because Plaintiff cannot make out a *prima facie* case of discrimination. In particular, Good Samaritan argues that Plaintiff cannot prove the third and fourth elements of his *prima facie* case. Regardless of whether Reddy can establish the third element (Good Samaritan argues that Plaintiff was given an equal opportunity to participate as a shareholder in AA/Northwest, thus having access to the contract in question), Plaintiff cannot establish the fourth element, to wit: that a Caucasian was given the contract. The majority of the shareholders of AA/Northwest were not Caucasians; rather, they were foreign-born and foreign medical school graduations ("FMGs"), including Indians like the Plaintiff, and an African–American.[18]

However, as stated above, a plaintiff alleging discrimination can establish his or her case through direct evidence.[19] *Manzer, supra.* Therefore, the Court must also inquire whether there is direct evidence of discrimination by Good Samaritan. Construing the evidence in the manner most favorable to the Plaintiff, the Court finds *no* direct evidence of discrimination by the hospital. The decision to enter into the exclusive contract was primarily Deck's. When it came time to select the physicians with whom Good Samaritan would contract, Deck chose Drs. Thomas and Seitzman, two white Americans. He made that decision even though Plaintiff was the superior practitioner. At best, those facts are nothing more than circumstantial evidence of discrimination.

Nevertheless, Plaintiff points to what might be termed a crusade against the number of FMGs in the Department of Anesthesiology at Good Samaritan, which occurred in 1984 and 1985. This is the so-called "quota" in the anesthesiology department of which Plaintiff complains. In support of his argument that Good Samaritan (in the person of Deck) had a bias against foreign minorities, Reddy states that Deck directed AA/Dayton to take into account the percentage of FMGs on staff when recruiting new anesthesiologists. A number of individuals have testified that a meeting was held in early 1989, at which Deck spoke with members of the Department of Anesthesiology about the number of FMGs in the Department of Anesthesiology. (*E.g.,* Doc. # 22 at 19–26, Testimony of Dr. Phungrasamee).[20] According to Deck's own deposition, he stated that:

[T]here were sensitivities in the medical staff in regard to AMG, FMG's training ... I encouraged them to find out what their customers wanted, in regard to the training of the people that they were going to bring in. If they wanted John[s] Hopkins, if they wanted Harvard grads, etc., etc., they needed to have people that would come in to this situation and work hard and practice medicine, and that's as bad as it got....

(Deck June 12, 1992 Dep. at 212–13).[21] Upon further question, he again stated

---

18. Drs. Thomas and Seitzman did not become employees or shareholders of AA/Northwest.

19. Direct evidence is evidence that, "if believed, proves the existence of discrimination 'without inference or presumption ... [s]uch evidence must truly be focused on the employment action at issue. Not only must it be evidence of discriminatory actions or statements of an employer, but the actions or statements at issue must correlate to the discrimination or retaliation complained of by the employee.'" *Evans v. Toys R Us, Inc.,*

221 F.3d 1334, 2000 WL 761803, n. 5 (6th Cir.2000) (citations omitted).

20. Dr. Phungrasamee testified during the preliminary injunction hearing that the meeting was called by Dr. Thomas, the Chair of the Department of Anesthesiology, and that the meeting was held in the Medical Education Department on the third floor of the hospital. He also stated that only members of AA/Dayton attended the meeting.

21. Plaintiff also cites to the deposition testimony of Merrill Bolton, who stated that he

that he was referring to training preferences (*id.* at 215). Although Deck acknowledged that most foreign medical school graduates are minorities (Deck June 12, 1992 Dep. at 208), his testimony, read in its entirety, does *not* constitute *direct* evidence of discrimination. Rather, the Court would be required to *infer* from the testimony, despite his emphasis that he was expressing concerns about the perception of foreign training, that he was using foreign medical school graduate as a euphemism for foreign-born minority. In addition, the Court has not found any other evidence which indicates that Deck used the term FMG to mean foreign-born minority, or that he treated non-Americans differently than American-born physicians. Accordingly, Deck's statements, at best, constitute circumstantial evidence of Good Samaritan's intent to discriminate against non-American-born minorities.

Moreover, the evidence indicates that the attempt to limit foreign-born minorities, if it did occur, was carried out primarily by Richard Jenkins, then the Chief of Surgery at Good Samaritan and not an employee of the hospital, and not by Deck, the person who made the decision about the exclusive contract. According to the Dr. Jenkins' deposition, he wrote a letter in 1985, which stated that he was concerned that if the majority of physicians in the Department of Anesthesiology consisted of foreign graduates, they would have a problem with the perception of the department's academic strength. (R. Jenkins Dep. at 176–79, Ex. 1, Ex. 2). However, Richard Jenkins' attempts to limit

the number of FMGs in the Anesthesiology Department at Good Samaritan is not direct evidence that the hospital (in the person of Deck) discriminated against Plaintiff when it entered into the exclusive contract with AA/Northwest. Accordingly, Good Samaritan is entitled to summary judgment on Plaintiff's claim that Good Samaritan violated § 1981 when it entered into the exclusive contract with AA/Northwest.

Plaintiff also contends that Good Samaritan violated § 1981 when it denied him the position of Medical Director for the new group which would have the exclusive contract for anesthesia services at Good Samaritan. The flaw with this argument is that the essential qualification for this position was that the director be a member of the group (Deck June 12, 1992 Dep. at 112) (stating that medical director was required to be Board certified and an officer of AA/Northwest).[22] Reddy, through no fault of Good Samaritan, failed to become a member of AA/Northwest. Thus, there is no genuine issue of material fact on the question of whether he was qualified for the position of Medical Director; he was not. Accordingly, Good Samaritan is entitled to summary judgment on Reddy's § 1981 claim.

### B. *AA/Dayton*

Plaintiff alleges that AA/Dayton has violated § 1981 by impairing five types of contracts, to wit: 1) a contract for anesthesia services at Good Samaritan; 2) a contract with AA/Northwest; 3) a contract for

had heard that Deck had made a "remark ... regarding the percentage of FMG's to American physicians on staff" during a meeting with AA/Dayton physicians (Bolton Dep. at 188). Mr. Bolton acknowledged that he did not attend that meeting, thus rendering his statement inadmissible hearsay. However, even assuming his statement is admissible, it

also fails to constitute direct evidence of discrimination by Mr. Deck.

22. Under the exclusive contract between AA/Northwest and Good Samaritan, the individual chosen by AA/Northwest for the position of Medical Director was also subject to the approval of the hospital (Deck June 12, 1992 Dep. at 114).

anesthesia services at Miami Valley; 4) a contract with AA/Dayton; and 5) contracts with patients, reimbursers, or referring physicians at Good Samaritan and/or Miami Valley. He also asserts a claim against AA/Dayton that his failure to be appointed Medical Director violated § 1981. With regard to Reddy's allegations arising out of the exclusive contract between Good Samaritan and AA/Northwest (items 1 and 2 above) and the selection of the position of medical director (item 6), the uncontroverted evidence establishes that AA/Dayton played absolutely no role in the decision of Good Samaritan to enter into the exclusive contract or the selection of a medical director. When Good Samaritan negotiated the abortive contract with Drs. Thomas and Seitzman, the two physicians were shareholders of AA/Dayton; however, the two negotiated on their *own* behalf and not that of AA/Dayton. Indeed, when the abortive contract was announced, Thomas and Seitzman also announced that they would be leaving AA/Dayton and forming their own practice group, RTHS, Inc. After the exclusive contract between Good Samaritan and Drs. Thomas and Seitzman was canceled, Good Samaritan announced that it would negotiate an exclusive contract only with a newly formed group, in which all anesthesiologists on staff would be given the opportunity to participate. Although many of AA/Dayton's then soon to become former shareholders participated in the negotiation of the exclusive contract, those negotiations were not conducted on behalf of AA/Dayton; rather, they were conducted on behalf of the individuals who would become shareholders of the new group (AA/Northwest). Once AA/Northwest was formed, it was that entity which negotiated with the anesthesiologists practicing at Good Samaritan regarding their joining the new group.[23] AA/Dayton did not negotiate with physicians regarding employment with AA/Northwest. Therefore, AA/Dayton did not refuse to contract with the Plaintiff or interfere with or otherwise prevent him from entering into an exclusive contract with Good Samaritan or AA/Northwest. AA/Dayton is entitled to summary judgment on those claims.

Plaintiff also contends that AA/Dayton interfered with a contract between him and AA/Dayton (item 4). However, Plaintiff has provided no evidence that he attempted to enter into a contract with AA/Dayton following his departure from that group in August of 1988. Accordingly, Plaintiff has provided no evidence of interference with such a contract. AA/Dayton is entitled to summary judgment on Plaintiff's § 1981 claim, based on impairment of a contract with AA/Dayton.

Plaintiff also contends that AA/Dayton violated § 1981 by interfering with his relationship with Miami Valley (item 3). As stated above, in July, 1990, Plaintiff sought to upgrade his staff privileges at Miami Valley, from courtesy to active. It was not until November, 1990, that Miami Valley granted his request. Plaintiff alleges that AA/Dayton interfered in that process. However, Plaintiff has provided no evidence is that AA/Dayton caused the delay. Rather, the cause of the delay was the Plaintiff's failure to secure the necessary letters of recommendation.[24]

■ Finally, Reddy asserts that AA/Dayton has violated § 1981 by impair-

23. As noted in footnote 26, *infra,* it is undisputed that AA/Northwest is a separate legal entity from AA/Dayton.

24. For instance, Plaintiff was not able to obtain a letter of recommendation from Dr. Alfred Jenkins, who was at that time the head of AA/Northwest. Dr. Jenkins testified that he refused to furnish the letter because of this litigation.

ing contracts between him and patients, reimbursers, or referring physicians at Good Samaritan and/or Miami Valley (item 5). Plaintiff argues that at Good Samaritan, AA/Dayton engaged in an "unmitigated course of harassment of Dr. Reddy and his group, ranging from the sudden imposition and enforcement of unreasonable rules to frequent quality reviews, unfair scheduling, and barriers to recruitment. That harassment was dedicated to thwarting Dr. Reddy's efforts to enter into contracts for anesthesia services with patients, reimbursers, and referring physicians and ultimately with Good Samaritan, Miami Valley, AAND, and AAOD itself." (Doc. # 125, p. 184).

Assuming that this claim is properly raised,[25] Reddy has failed to establish that AA/Dayton's interference with the formation of such contracts was the result of racial discrimination. As thoroughly detailed in his opposition memorandum, the alleged harassing conduct began with the formation of B.K. Reddy and Associates. As he states, AA/Dayton was adamantly opposed to the creation of a new group by Reddy. For example, Plaintiff quotes the deposition of Dr. Thomas, stating "[a]lot of people in our group I think saw [formation of B.K. Reddy and Associates] as a threat or whatever." (Doc. # 125, p. 40) (quoting Thomas Dep. June 10, 1992, at 95) He also states, "The AA[/Dayton] President at the time conceded that he knew of no reason other than Dr. Reddy's intent to form a competing group for discussion of the Doctor to CRNA ration." (*Id.* at 50, *quoting*

Avutu Jul. 12, 1993, Dep. at 94). Plaintiff provides further evidence that the changes in the CRNA supervision rules and geographic proximity rules were instituted soon after the creation of B.K. Reddy and Associations (Bolton Dep. at 57, 61–63, 75–77). Reddy provides evidence that these adverse changes were not enforced against other anesthesiologists practicing at Good Samaritan to the degree that they were enforced against his group (B.K. Reddy 1992 Dep. at 532). In addition, Plaintiff provides evidence that he was treated inequitably in scheduling, a function performed during part of the relevant time period by Dr. Thomas and in referrals. However, this evidence does not support a reasonable inference that the opposition, which allegedly resulted in interference with Plaintiff's contracts with patients, reimbursers and other physicians, was due to the fact that Plaintiff is a non-Caucasian. Rather, the only reasonable inference from the evidence cited by Plaintiff is that the opposition to his new group—and the interference with contracts that allegedly stemmed from that opposition—was the result of AA/Dayton's desire to rid itself of Reddy's competition. Moreover, the undisputed evidence indicates that the anesthesiologists at AA/Dayton, who allegedly reaped the increased business from patients, reimbursers, and referring physicians in lieu of Plaintiff, were not predominantly Caucasian. The anesthesiologists/shareholders of AA/Dayton at Good Samaritan consisted of a number of minorities, including Dr. Avutu (Indian), Dr.

---

**25.** Plaintiff's § 1981 claim that AA/Dayton interfered with his ability to contract with patients, other physicians, and reimbursers appears to be raised for the first time in his memorandum in opposition to summary judgment. However, such claims are viable under § 1981. *Vakharia v. Swedish Covenant Hosp.*, 765 F.Supp. 461, 471 (N.D.Ill.1991) ("In protecting the right to make contracts, section 1981 proscribes not only discrimina-

tion by the contracting party at the contract-formation stage but also discriminatory interference by a third party with the exercise of the right to make contracts.") Because AA/Dayton addresses these allegations under Title VII, which uses the same analytical framework, the Court will assume these claims have been properly raised and will address them.

Alfred Jenkins (African–American), Dr. Baldemor (Filipino), Dr. Phungrasamee (Thai), and Dr. N.G. Reddy (Indian).[26] Thus, Plaintiff has not established that a Caucasian received the contracts instead of Plaintiff. Accordingly, AA/Dayton is entitled to summary judgment on Plaintiff's § 1981 claims against it.

### C. AA/Northwest

In his Opposition Memorandum, Plaintiff focuses on the conduct of AA/Dayton, which he argues constitutes discrimination and retaliation, as defined under § 1981. In addressing AA/Northwest's liability, Reddy contends that it should be held responsible for AA/Dayton's actions under the theory of successor liability. To support his contention, he submits that AA/Dayton and AA/Northwest share an office, equipment, software, office manager, billings and payroll process and policies, staff, accountants, and law firm. Moreover, he notes that AA/Dayton and AA/Northwest have not kept their business and tax information confidential from each other, and that personnel records were retained from one to the other. As Reddy puts in, "AAND came forth from AAOD's womb."[27] He also argues that liability should attach to AA/Northwest, because Plaintiff made, and AA/Northwest knew of, numerous complaints of discrimi-

nation and retaliation before AA/Northwest was formed. AA/Northwest sharply disputes the contention that AA/Northwest is a successor corporation of AA/Dayton. It asserts that no liability can attach to it, because no charges or lawsuits were pending at the time that it was formed. It further argues that AA/Dayton still exists, and can provide relief to Plaintiff for its own unlawful conduct.

Having set forth these arguments, the Court need not resolve the issue of whether AA/Northwest may be held liable under § 1981, based on successor liability. Because the Court concludes that AA/Dayton is entitled to summary judgment on Plaintiff's § 1981 claims against it, Plaintiff's argument that AA/Northwest is liable for AA/Dayton's actions, as that Defendant's successor corporation, is moot. AA/Northwest is, therefore, also entitled to summary judgment on Reddy's § 1981 claims.

### IV. *Plaintiff's claims under § 1 of the Sherman Act and the Valentine Act (O.R.C. Chapter 1331) (Plaintiff's Second and Third Claims for Relief)*

■ In his Second Amended Complaint, Plaintiff alleges that the Defendants violated § 1 of the Sherman Act and the Valentine Act by conspiring to boycott him, by allocating patients, and by unreason-

---

**26.** The other members of AA/Dayton at Good Samaritan consisted of Drs. Seitzman and Thomas. As stated above, these physicians began their own group, RTHS, Inc., in late 1989 and never became members of AA/Northwest. In addition, Drs. Grigg, Ralston and Saleh were employees of AA/Dayton. Dr. Saleh is Egyptian.

**27.** Plaintiff has provided the Court with the Unanimous Written Consent of Directors of Anesthesia Associates of Northwest Dayton, Inc., and the attached Agreement and Plan of Corporate Separation and Reorganization and the Billing Service Agreement (Appendix in Opp. to Motion for Summ. J., Vol. I., Ex. 41). According to the Corporate Separation

and Reorganization agreement, AA/Dayton was to create AA/Northwest as a corporate subsidiary. The AA/Dayton members who practiced at Good Samaritan were to surrender their AA/Dayton stock and would receive an equal number of AA/Northwest in exchange. In essence, the documents reflect that AA/Dayton was to split into two separate entities, to wit: 1) AA/Dayton, which would consist of the AA/Dayton members who practiced primarily at Miami Valley Hospital, and 2) AA/Northwest, which would consist of AA/Dayton members who practiced primarily at Good Samaritan. It is undisputed, however, that AA/Northwest is legally a separate corporate entity from AA/Dayton.

ably restraining competition.[28] Reddy contends that he suffered injuries when he was excluded from practicing at Good Samaritan as a result of the exclusive contract between the hospital and AA/Northwest and by the restrictions which were imposed by Good Samaritan while he practiced there under his sole proprietorship. Although the Defendants raise a number of arguments in support of their motion for summary judgment, the Court need only address whether the Defendants have violated § 1 of the Sherman Act.[29]

■ Section 1 of the Sherman Act provides that every contract, combination and conspiracy in restraint of trade is illegal. Courts employ two tests to determine whether particular concerted activity violates § 1, to wit: the *per se* analysis and the rule of reason. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 457–58, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1088 (6th Cir.1996); *Lie v. St. Joseph Hosp.*, 964 F.2d 567 (6th Cir.1992). When the activity is assessed under the rule of reason, "the plaintiff must show that the conspiracy has the potential to produce 'ad-

verse, anti-competitive effects within the relevant product and geographic markets.'" *Id.* at 568 (citation omitted). When the activity is considered to be a *per se* violation, there is no need to examine the impact on the relevant markets, because the effects of the activity are deemed to be necessarily anti-competitive. *Id.* at 569. Defendants contend that the Plaintiff's allegations must be analyzed under the rule of reason. Plaintiff argues that the *per se* rule is applicable. In his memorandum in opposition to the motions for summary judgment, Plaintiff argues that Defendants have committed two types of *per se* violations, to wit: a group boycott and an allocation of patients.

■ The Court's choice between the *per se* rule and the rule of reason is largely driven by analogy. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1089 (6th Cir. 1996). "A court should find a *per se* antitrust violation only when prior cases have established the anticompetitive effects of a sufficiently similar business practice." *Id.* The Court, therefore, will initially examine Plaintiff's two arguments regarding the existence of *per se* violations to determine

---

**28.** In his second amended complaint, Reddy also alleges that the Defendants conspired to fix prices. In his memorandum in opposition to the motions for summary judgment, Plaintiff does not specifically argue this theory. The only passing mention of price fixing is conduct which allegedly occurred after he left Good Samaritan and after AA/Dayton entered into its exclusive contract with Miami Valley. If Reddy is alleging that such conduct constituted price fixing, he does not have a valid claim, because that conduct occurred (if it occurred) after he was no longer practicing anesthesiology in the Dayton area. The right to bring an action for violations of the antitrust laws is conferred upon private parties by § 4 of the Clayton Act, 15 U.S.C. § 15; however, that statute limits the right to bring such an action to any person who has been "injured in his business or property by reason of anything forbidden in the antitrust laws." Since Reddy was no longer practicing anesth-

esiology in the Dayton area when the Defendants allegedly engaged in price fixing, he cannot have been injured in his business or property as a result of that alleged illegal activity and, therefore, cannot maintain an action upon that activity.

**29.** It is settled that the Valentine Act is governed by the same standards which govern the Sherman Act. *See e.g., C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St.2d 201, 204, 407 N.E.2d 507, 509 (1980); *Lee v. United Church Homes, Inc.*, 115 Ohio App.3d 705, 708–09, 686 N.E.2d 288, 291 (1996); *Richter Concrete Corp. v. Hilltop Basic Resources*, 547 F.Supp. 893, 920 (S.D.Ohio 1981), *aff'd*, 691 F.2d 818 (6th Cir.1982). Therefore, if Defendants are entitled to summary judgment on Plaintiff's claim under § 1 of the Sherman Act, they are also entitled to summary judgment on Plaintiff's claim under the Valentine Act.

whether they are the type of conduct which courts have found to be *per se* antitrust violations. Should it conclude that no such violation exists, it will turn to the question of whether the Defendants are entitled to summary judgment under a rule of reason analysis.

■ *First,* a group boycott can in some limited circumstances constitute a *per se* violation. *Balaklaw v. Lovell,* 14 F.3d 793, 800 (2d Cir.1994). In *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), the Supreme Court noted that there is a reluctance to expand the category of *per se* violations and concluded that a group boycott is a *per se* violation only "when firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *Id.* at 458, 106 S.Ct. 2009. Herein, Plaintiff does not allege (much less present evidence) that the Defendants engaged in the type of group boycott referred to in *Indiana Fed'n of Dentists.* Rather, Plaintiff alleges that the decision to exclude him from practicing at Good Samaritan constituted a group boycott. The alleged type of activity, however, is not the type of group boycott recognized by the Supreme Court. *See Minnesota Assoc. of Nurse Anesthetists v. Unity Hosp.,* 208 F.3d 655, 659 (8th Cir.2000) (rejecting claim by CRNAs that sole-source contracts are *per se* unlawful group boycotts, because they prevent nurse anesthetists from performing anesthesia services at the defendant hospitals). Therefore, Plaintiff does not state a *per se* claim based upon an alleged group boycott.

■ *Second,* with respect to Plaintiff's claim that the Defendants have allo-

cated customers and that such conduct constitutes a *per se* violation, Plaintiff focuses on alleged vertical agreements between Good Samaritan and AA/Dayton and AA/Northwest. In general, the Supreme Court has limited the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors. *See NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). With regard to vertical restraints, the Supreme Court has stated that "vertical restraint is not illegal per se unless it includes some agreement on price or price levels." *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 735–36, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Thus, the rule of reason is applicable to vertical non-price restraints on customers. *Id.; Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Herein, Reddy does not allege that the vertical agreement between Defendants Good Samaritan and AA/Dayton and AA/Northwest concerned price or price levels.[30] Therefore, Plaintiff does not state a *per se* claim based upon an alleged allocation of patients.

■ Since a *per se* violation is not implicated by this case, the Court must apply the rule of reason. As stated above, the rule of reason requires the Plaintiff to prove that the alleged concerted activity had anti-competitive effects in the relevant product and geographic markets. *Lie,* 964 F.2d at 568. Herein, the Defendants argue and present evidence that the relevant product market is the market in which anesthesiologists compete for jobs, which, Defendants contend, is a national market.[31] The Court agrees with the Defendants'

**30.** Plaintiff does not appear to allege that AA/Northwest and AA/Dayton conspired to allocate patients. Rather, Plaintiff appears to allege that Good Samaritan and AA/Dayton conspired to allocate patients, and when AA/Northwest began providing anesthesia services at the hospital, Good Samaritan con-

spired with that group. Accordingly, Plaintiff alleges only vertical agreements, and not a horizontal agreement between competitors.

**31.** Plaintiff has not presented contrary evidence.

contention that the relevant product market is that for anesthesiologists. The crux of Plaintiff's antitrust claim is that Defendants prevented him from practicing as an anesthesiologist at Good Samaritan and that the adoption of the restrictive rules at that hospital on the practice of anesthesiology made it more difficult for him to engage in that practice. In other words, Plaintiff seeks to recover damages because Defendants have prevented him from practicing his profession at Good Samaritan.

Other courts have concluded, in the context of a hospital entering into an exclusive contract with a group of physicians for the provision of a particular specialty, that the relevant product market is the market in which the physicians compete for jobs. *Balaklaw*, 14 F.3d at 799; *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473 (7th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). Herein, the evidence establishes that anesthesiologists compete in a nationwide market for jobs and that there are approximately 25,000 of those jobs. Preventing the Plaintiff from practicing his profession in one hospital cannot have anti-competitive effects in that market. Indeed, after the exclusive contract and failure to join AA/Northwest prevented the Plaintiff from practicing at Good Samaritan, and his subsequent inability to practice anesthesiology at Miami Valley, he obtained employment with a group of practitioners who had an exclusive contract with a hospital in Scranton, Pennsylvania, and he is now head of anesthesiology at the Veteran's Administration Hospital in Dayton.

■ Even if we assume, *arguendo*, that the product market is the provision of anesthesia services, as the Plaintiff argues, the evidence establishes that the exclusion of the Plaintiff from Good Samaritan and Miami Valley does not have an anti-competitive effect on the market. In his answers to interrogatories, Plaintiff asserts that the geographic market in which Good Samaritan competes is the Dayton Standard Metropolitan Statistical Area ("SMSA"), which is comprised of four counties, Montgomery, Clark, Greene and Miami. William Lynk, Good Samaritan's expert witness, states in his affidavit that Good Samaritan competes in a seven county area. Nevertheless, accepting Plaintiff's definition of the geographic market, Lynk states that Good Samaritan's market share is no greater than 14.7% of the hospital services market.[32] Miami Valley's market share is between approximately 16 and 18%. (Lynk Aff., Tables 2 & 3). Courts have recognized that entities with market shares as small as Miami Valley and Good Samaritan's, both considered separately and combined, do not unreasonably restrain competition by entering into an exclusive contract. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (30% market share not sufficient); *Ezpeleta v. Sisters of Mercy Health Corp.*, 800 F.2d 119 (7th Cir.1986).

In sum, the evidence in this case and the law do not support Plaintiff's contention that a *per se* violation has occurred. Applying the rule of reason, the evidence establishes that the allegedly unlawful acts of the Defendants have not had an anti-competitive effect on the relevant product market, however that market is defined. Based upon the foregoing, the Court concludes that the Defendants are entitled to summary judgment on Plaintiff's claims under § 1 of the Sherman Act and the Valentine Act.

---

**32.** The provision of anesthesia services at a hospital is not a distinct service which is separate from the provision of other services, such as surgery or obstetrics, at that hospital. Therefore, the market for anesthesia services is the same as that for hospital services generally.

V. *Tortious Interference with Contractual Relationships (Plaintiff's Fourth Claim for Relief)*

 Plaintiff alleges that the Defendants interfered with his prospective contractual relationships with future patients when AA/Northwest and Good Samaritan entered into the exclusive contract. A claim for tortious interference with contractual relations occurs, *inter alia*, when a person, without a privilege to do so, purposefully causes a third party not to enter into a contract with another. *A & B–Abell Elevator v. Columbus/Cent. Ohio Bldg.*, 73 Ohio St.3d 1, 651 N.E.2d 1283 (1995); *Kand Med. v. Freund Med. Prods.*, 963 F.2d 125 (6th Cir.1992). In order to determine the existence of a privilege, the fact-finder must consider: "(a) the nature of the actor's conduct; (b) the nature of the expectancy with which his conduct interferes; (c) the relationship between the parties; (d) the interest sought to be advanced by the actor; and (e) the social interest in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." *Juhasz v. Quik Shops, Inc.*, 55 Ohio App.2d 51, 57, 379 N.E.2d 235, 238 (1977). AA/Dayton is entitled to summary judgment on this claim, since it was not involved in the exclusive contract between AA/Northwest and Good Samaritan. Good Samaritan and AA/Northwest argue that they had a privilege to enter into the exclusive contract and that, therefore, they are also entitled to summary judgment on Plaintiff's tortious interference claim. This Court agrees.

Courts in Ohio have recognized that it is perfectly legitimate for a hospital to enter into an exclusive contract with one or more of the providers of medical services. In *Holt v. Good Samaritan Hosp. & Health Ctr.*, 69 Ohio App.3d 439, 590 N.E.2d 1318 (1990), Judge Brogan of the Second District Court of Appeals noted that adoption of the plaintiff/physician's argument that a hospital breaches its contract with a physician by entering into an exclusive contract with another provider "would be the death knell of exclusive contracts for medical services." 590 N.E.2d at 1321. Judge Brogan concluded by writing, "[w]e will not substitute our judgment for that of hospital boards throughout the nation, by removing a managerial option that has been universally acknowledged as valid and beneficial to the efficient administration of health care." *Id.* As the Defendants, Good Samaritan in particular, argue, it would defy logic to say that a hospital can enter into an exclusive contract with a group of physicians providing a particular service, but that it does not have a privilege to do so for purpose of a claim of tortious interference with prospective contractual relationships, in which an excluded physician argues that the hospital is liable for all of the business that physician has lost. Other courts have concluded that a hospital has a privilege to enter into an exclusive contract, so that an excluded physician does not have a valid claim for tortious interference with prospective contractual relations. *See, e.g., Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473 (7th Cir.1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). Herein, Plaintiff has not established that the exclusive contract between AA/Northwest and Good Samaritan is unlawful. Accordingly, the Court concludes that the Defendants enjoyed a privilege to enter into an exclusive contract and are, therefore, entitled to summary judgment on Plaintiff's claim of tortious interference with contractual relationships.

VI. *Common law breach of contract (Plaintiff's Fifth Claim for Relief)*

 In Plaintiff's claim of breach of contract, which he has asserted against Good Samaritan alone, Reddy alleges that Good Samaritan breached its contract with

him (the Medical Staff Bylaws) when it entered into the exclusive contract with AA/Northwest. Plaintiff contends that, by entering into the exclusive contract, Good Samaritan terminated his staff privileges without affording him a fair hearing, which he asserts the bylaws require.

Ohio appellate courts which have been faced with similar claims have uniformly rejected them. For instance, in *Holt, supra*, Good Samaritan and the plaintiff's medical corporation had entered into contract, by which the medical corporation was given the exclusive right to provide emergency room services at the hospital. When that contract expired, the hospital entered into an exclusive contract with another medical corporation. The plaintiff chose not to join the new provider, because it paid lower compensation. As a result, the plaintiff was not permitted to work in the hospital emergency room, even though he still held privileges to do so.

The plaintiff alleged that he was entitled to a hearing, based upon the common law, R.C. 3701.351(B), and contractual obligations allegedly created by the bylaws of Good Samaritan, before the hospital could limit his privileges. The Montgomery County Court of Appeals, assuming that the bylaws constituted a contract, concluded that, by failing to provide a hearing, Good Samaritan did not breach its contract with a physician who was prevented from practicing in the hospital's emergency room when a new corporation obtained an exclusive contract to provide emergency room services. The court distinguished between the revocation of his employment (as a result of his refusal to be employed by the new exclusive provider) and the reduction or revocation of his privileges. It stated that, although his ability to work in the emergency room had been precluded by the exclusive contract, his privileges had not been reduced or revoked. Therefore, it concluded that the bylaw provi-

sions, which gave physicians the right to a hearing prior to reduction or revocation of their privileges, were inapplicable, and Good Samaritan had not breached that contract with the plaintiff. The Franklin County Court of Appeals has reached the same conclusion. *Williams v. Hobbs*, 9 Ohio App.3d 331, 460 N.E.2d 287 (1983) (hospital did not violate its Code of Regulations when it terminated the radiology clinical privileges of the plaintiff-physician, because of the hospital's exclusive contract with plaintiff's former employer).

The court in *Stutzman v. U.S. Health Corp.*, 1993 U.S. Dist. Lexis 19100 (S.D.Ohio 1993), went one step further and concluded that a hospital lawfully terminated a physician's privileges after it entered into an exclusive contract with other physicians. The *Stutzman* court rejected the plaintiff's attempt to distinguish his scenario, in which his privileges had formally been revoked following the entrance of the exclusive contract, from *Holt*, where only the ability to practice had been curtailed. In so doing, the court stated that the plaintiff was in same position as that in *Holt*, and the underlying rationale in *Holt* was applicable. The plaintiff had also attempted to distinguish *Hobbs*, stating that the bylaws in *Hobbs* permitted the termination of privileges in accordance with other provisions and specifically provided for exclusive contracts, while the defendant hospital had no such provisions. The court also rejected that argument, stating that nothing in the bylaws precluded the hospital from entering into an exclusive contract, and such a contract would fall within the management authority with which it was vested. Based thereon, the court held that the hospital did not breach its contract with the plaintiff when it terminated his privileges after entering into an exclusive contract with other physicians.

The case before the Court is virtually identical to *Holt*. As stated by Plaintiff,

"[Dr. Reddy] still has privileges, but he may not practice and could only secure the right to do so by submitting to an at-will relationship where his privileges would be lost upon discharge by AAND." (Doc. # 125, p. 229) Accordingly, Plaintiff has acknowledged that his privileges at Good Samaritan were not formally revoked. Accordingly, the hearing provisions, as set forth in Article IX of the Good Samaritan Medical Staff Bylaws (Pl.'s Prelim. Inj. Ex. 21), are inapplicable.[33]

However, even assuming that the bylaws constitute the basis of a contract between Reddy and Good Samaritan and that Reddy's clinical privileges were formally revoked, Defendant would still be entitled to summary judgment. The regulations of Good Samaritan vest the Board of Directors with the duty and authority to manage all of the affairs, property and funds of the hospital. (Pl.'s Prelim. Inj. Ex. 22, Art. VI) Although there is no express authorization for the hospital to enter into exclusive contracts, there is similarly nothing in the bylaws which precludes such contracts. Accordingly, the hospital's entering into an exclusive contract would fall within the Board's management authority. *See Stutzman, supra.* Accordingly, this Court concludes that the limitation on Reddy's privileges at Good Samaritan (whether imposed formally as a result of his failure to join AA/Northwest, or by practical application of the hospital's exclusive contract with AA/Northwest) does not constitute a breach of contract as a matter of law. Good Samaritan is entitled to summary judgment on that state law claim.

## VII. Retaliation/Discrimination under Title VII and O.R.C. § 4112.99 (Plaintiff's Sixth Claim for Relief)

■ In his Second Amended Complaint, Reddy alleges that Good Samaritan, AA/Northwest, and AA/Dayton retaliated against him, because he opposed discrimination on the basis of race, color, ethnicity and national origin, in violation of Title VII and Chapter 4112.[34] In order for Reddy to establish a *prima facie* case of retaliation, he must establish that: (1) he engaged in an activity protected by Title VII; (2) the exercise of the protected activity was known by the defendant; (3) thereafter, the defendant took an adverse employment action, or the plaintiff was subjected to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.[35] *Morris v. Oldham County Fiscal*

---

**33.** Section 9.1.1 of the bylaws provides, in pertinent part:

The following recommendations or actions shall, if deemed adverse pursuant to Section 9.1.2, entitle the practitioner affected thereby to a hearing: ...
 c. Suspension of staff membership
 d. Revocation of staff membership ...
 g. Limitation of admitting privileges ...
 j. Reduction in clinical privileges
 k. Suspension of clinical privileges
 l. Revocation of clinical privileges....

**34.** As outlined in discussing Plaintiff's claims under § 1981, the Supreme Court has established a burden shifting analysis for claims under Title VII.

**35.** Similarly, to state a claim under Chapter 4112 for retaliation, a plaintiff must establish: (1) he engaged in a protected activity, (2) the defendant knew of his participation in the protected activity, (3) the defendant engaged in retaliatory conduct, and (4) the alleged retaliatory action followed the plaintiff's protected activity sufficiently close in time to warrant the inference of retaliatory motivation. *Wille v. Hunkar Laboratories, Inc.*, 132 Ohio App.3d 92, 107, 724 N.E.2d 492, 503 (Hamilton Cty.1998). Ohio courts have held that, when interpreting Ohio Rev.Code Ch. 4112, it is appropriate to look to analogous federal statutes, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. *See Wooten v. Columbus, Div. of Water*, 91 Ohio App.3d 326, 334, 632 N.E.2d 605

*Ct.,* 201 F.3d 784 (6th Cir.2000); *Fenton,* 174 F.3d at 831; *Barnett v. Department of Veterans Affairs,* 153 F.3d 338, 343 (6th Cir.1998), *cert. denied,* 525 U.S. 1106, 119 S.Ct. 875, 142 L.Ed.2d 775 (1999). In lieu of proving a *prima facie* case, Reddy may present direct evidence of discrimination and retaliation. With this standard in mind, the Court turns to Plaintiff's specific claims against Defendants.

### A. AA/Dayton [36]

▆ Plaintiff alleges that AA/Dayton retaliated against him, because he opposed discrimination on the basis of race, color, ethnicity and national origin, by: 1) the improper application of rules, 2) denying him rights guaranteed by Good Samaritan's bylaws, 3) denying him referral and physician/patient relationships, 4) denying him a contract to provide anesthesia services at the hospital, and 5) denying him a leadership position in a group to provide anesthesia services. Plaintiff's claims fail for a number of reasons.

The Court initially notes that Plaintiff has failed to demonstrate that he engaged in a protected activity. In his memorandum, Reddy argues at great length that during the mid 1980s, Good Samaritan had a quota policy regarding FMGs. He states that Dr. Jenkins wrote a letter in 1985 which stated that the Department of Anesthesiology needed more AMGs. Other physicians stated that Good Samaritan needed a balance between FMGs and AMGS due to the perception among medical school graduates that a department that was heavily weighted with FMGs or AMGS was a weaker department. In addition, he provides evidence that Deck di-

rected AA/Dayton to take into account the percentage of FMGs on staff when hiring new anesthesiologists, thereby directing AA/Dayton to hire AMGs. Reddy further provides evidence of derogatory comments by Dr. Thomas, who used such phrases as "towel heads" to refer to Asian Indian physicians (A. Jenkins May 13, 1992 Dep. at 136).

Despite this evidence, Plaintiff has cited only two instances where he opposed discrimination on the basis of race, color, ethnicity, or national origin. *First,* in discussing the formation of the exclusive contract between AA/Northwest and Good Samaritan, Plaintiff states that he was not considered as a leader who could build consensus among the anesthesiologists, because Reddy "complain[ed] about not being treated fairly" (Doc. # 125 at 126). This statement, even construed in the light most favorable to Plaintiff, cannot establish that Plaintiff had complained about conduct prohibited by Title VII.

*Second,* he states that in 1983 or 1984, a number of FMGs, including himself, talked to the Chief of Staff regarding discrimination due to exclusion from leadership positions at Good Samaritan. However, Plaintiff has not argued that the complaints were regarding AA/Dayton's discriminatory conduct, or that AA/Dayton was aware of the conversation between the FMGs and the Chief of Staff. Accordingly, Plaintiff has not provided evidence that these complaints constitute engaging in protected activity with regard to the conduct of AA/Dayton.

Even assuming that the 1983/1984 complaints satisfy the requirement that Plain-

---

(1993); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128 (1981). Accordingly, the Court's analysis under Title VII applies equally to Plaintiff's claims under Chapter 4112.

**36.** Plaintiff's Title VII discrimination/retaliation claims against AA/Dayton were previously dismissed (Doc. # 68). Accordingly, only Reddy's claims under Chapter 4112 remain as to AA/Dayton.

tiff engaged in a protected activity, Plaintiff has failed to present any evidence that those complaints caused the retaliatory harassment of which he complains. In order to show a causal connection, a plaintiff must produce evidence from which an inference can be drawn that his protected activity was the likely reason for the adverse action. *See Zanders,* 898 F.2d at 1135; *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986). "Although no one factor is dispositive in establishing a causal connection, evidence that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Harris v. King,* 210 F.3d 371, 2000 WL 353676 (6th Cir.2000), citing *Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 230 (6th Cir.1987). However, temporal proximity alone is insufficient to create a genuine issue of material fact on the issue of causation. *Id.; Hill v. Christ Hosp.,* 131 Ohio App.3d 660, 669, 723 N.E.2d 581, 588 (Hamilton Cty. 1998) ("Proximity in time is not enough to establish a causal connection between the filing of the lawsuit and [plaintiff's] termination.").

■ Plaintiff has argued that he was subjected to inequitable application of new Department of Anesthesiology rules and procedures, and that he was denied rights guaranteed by Good Samaritan's bylaws, referral and physician/patient relationships, a contract to provide anesthesia services at the hospital, and a leadership position in a group to provide anesthesia services. However, all of the alleged retaliatory conduct occurred subsequent to Reddy's departure from AA/Dayton and his formation of a separate anesthesia practice in 1988, a minimum of four years after the meeting with the Good Samaritan Chief of Staff. A four year lapse in time between the alleged protected conduct and the alleged retaliation is insuffi-

cient, as a matter of law, to establish causation. *Baker v. Buschman Co.,* 127 Ohio App.3d 561, 568, 713 N.E.2d 487, 492 (Butler Cty.1998) (one year lapse between discrimination complaint and adverse employment action was insufficient to establish a causal connection between the two) (citing Sixth Circuit authority); *see Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir.1998) (no inference of causation with five month lagtime); *Vass v. Riester & Thesmacher Co.,* 79 F.Supp.2d 853, 862 (N.D.Ohio 2000) (timing does not create inference of retaliation where adverse action occurred one year after filing of discrimination charge); *Lynk v. Henderson,* 2000 WL 178859 (S.D.N.Y. Feb.15, 2000) (not reasonable to infer that letter of warning was caused by filing of EEOC complaint three years earlier); *Blumensaadt v. Standard Prods. Co.,* 744 F.Supp. 160 (N.D.Ohio 1989), *aff'd,* 911 F.2d 731, 1990 WL 120927 (6th Cir.1990) (table) (20 months insufficient); *Reeves v. Digital Equip. Corp.,* 710 F.Supp. 675 (N.D.Ohio 1989); *Silinzy v. Visiting Nurse Ass'n,* 777 F.Supp. 1484 (E.D.Mo.1991) (approximately 11 months insufficient to establish causal connection). Plaintiff has provided no other evidence, direct or indirect, to support his contention that AA/Dayton's alleged retaliatory conduct was due to his opposition to discrimination.

Finally, Plaintiff has not demonstrated that AA/Dayton engaged in the alleged retaliatory conduct. Plaintiff's allegation that AA/Dayton denied him a leadership position in an anesthesiology group is based on the fact that he was not named Medical Director. In his deposition, Dr. Reddy states that it was his understanding, based on conversations with three members of AA/Northwest,[37] that Good Samaritan had selected Dr. Ralston to be

---

37. Specifically, he spoke with Drs. Phungra- samee, Saleh, and Avutu.

Medical Director (Reddy 1992 Dep. at 77). In addition, Plaintiff states that he expressed interest in the Medical Director position only by means of correspondence to Good Samaritan from his attorney, Mr. Witten (*id.* at 79). There is no evidence that he expressed his interest in the position to AA/Dayton or that AA/Dayton had any influence on the selection of the ultimately successful physician for Medical Director. To the contrary, the evidence indicates that AA/Northwest selected the individual to be Medical Director and that this individual was subject to the approval of Good Samaritan. AA/Dayton played no role in that decision. Similarly, there is no evidence that AA/Dayton played any role in Good Samaritan's decision to enter into an exclusive contract with a group other than B.K. Reddy and Associates. The uncontroverted evidence establishes that the Board of Directors of Good Samaritan directed Deck not to enter into a contract with any of the three existing corporations (AA/Dayton, B.K. Reddy, and RTHS). Since AA/Dayton had no connection with these adverse employment decisions (assuming that the failure to enter into an exclusive contract with the Plaintiff and the failure to name him as the Medical Director of the new group are adverse employment decisions), he cannot prove that AA/Dayton subjected him to an adverse employment decision. Accordingly, AA/Dayton is entitled to summary judgment on Plaintiff's retaliation claim under Chapter 4112.[38]

### B. *AA/Northwest*

In Count Six, Reddy alleged that AA/Northwest retaliated against him by withdrawing advantageous terms of employment from him, by refusing to employ him, by denying him a contract to provide anesthesia services at the hospital, and by denying him a leadership position in a group to provide anesthesia services, because he filed charges of discrimination and participated in proceedings under Title VII and Chapter 4112. AA/Northwest argues that it is entitled to summary judgment on Plaintiff's claims on the ground that it is not an employer within the meaning of the statutes. In particular, it asserts that Reddy was offered an opportunity to become a shareholder in AA/Northwest and that a shareholder of a professional corporation is not an "employee" entitled to protection under Title VII and Chapter 4112. Reddy responds that Title VII and Chapter 4112 prohibit discrimination against "any individual" (Title VII) and any person (Chapter 4112). Relying on *Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870 (6th Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991), he argues that Sixth Circuit authority imposes liability on anyone who, with discriminatory animus, "realistically prevents" and "clearly interferes with" employment opportunities.

Whether a particular situation is an employment relationship is a question of law for the Court. *Imars v. Contractors Mfg. Servs., Inc.*, 165 F.3d 27, 1998 WL 598778 (6th Cir.1998). Resolution of this issue is appropriate at the summary judgment stage, provided that there are no genuine issues of material fact. Although Title VII and Ohio Rev.Code Ch. 4112 are treated as analogous statutes and are interpreted similarly, the two statutes differ in their definitions of the term employer. *See Ge-*

---

**38.** Because Plaintiff has not established a claim under Chapter 4112, the Court need not address whether Plaintiff's claims fall with the statute of limitations of that statute or whether AA/Dayton was an employer under that statute. *See Cruz v. South Dayton Urolog-*

*ical Assoc., Inc.*, 121 Ohio App.3d 655, 700 N.E.2d 675 (Montgomery Cty.1997) (physician-shareholders of professional corporation were employees of the corporation where each was employed by a written agreement).

naro v. Central Transport, Inc., 84 Ohio St.3d 293, 703 N.E.2d 782 (1999) (stating that supervisors and managers can be held personally liable for unlawful discriminatory acts committed by such persons, in violation of Ohio Rev.Code Chapter 4112, even though such individuals cannot be liable under Title VII). Accordingly, a determination of whether AA/Northwest may be held liable as an employer under Title VII does not necessarily lead to the same conclusion under Chapter 4112.

### 1. Employer Status Under Chapter 4112

■ Although the Court has found few cases which address whether a professional corporation may held liable under Chapter 4112 for discriminatory conduct against an shareholder, that issue was implicitly resolved in Cruz v. South Dayton Urological Associates, Inc., 121 Ohio App.3d 655, 700 N.E.2d 675 (Montgomery Cty.1997). In Cruz, a urologist brought suit against a professional corporation, alleging that his employment with that urological group had been unlawfully terminated on the basis of age. The plaintiff was one of five shareholders in the corporation. In setting forth the factual background of the case, the court of appeals stated:

> Each of the five physician-shareholders of [the corporation] was or is an employee of the corporation. Each was or is employed pursuant to a written agreement. The agreements provided inter alia, that either [the corporation] or the employee could terminate the employment contract, unilaterally and without specification of cause, upon ninety days' written notice. The contract also provided for the employee's compensation on termination. A separate shareholders agreement required [the corporation] to repurchase the employee's stock, at book value, after his employment was terminated.

Id. at 658, 700 N.E.2d 675. The court then proceeded to discuss whether the plaintiff, as an employee, had established his state law age discrimination claim. Although not directly addressing whether a shareholder of a professional corporation could also constitute an employee of that corporation, the court implicitly acknowledged that shareholder status does not preclude employee status, if employment is indicated. Accordingly, based on Cruz, even if the Court were to accept AA/Northwest's argument that it had offered Reddy a position as shareholder, it would not be entitled to summary judgment for Plaintiff's state law retaliation claim on the ground that it is not an employer, provided that Plaintiff has provided evidence that he was also offered a position with AA/Northwest as an employee.

In support of its argument that Reddy was offered an opportunity to become a shareholder of AA/Northwest, Defendant cites to the affidavit of Dr. Alfred Jenkins, which indicates that, like other shareholders, Plaintiff would have been responsible for the satisfactory provision of AA/Northwest's services to Good Samaritan and for the general administration of the practice. Dr. Jenkins further testified that, unlike employees of the corporation, Reddy's compensation would be based, in part, on a share of AA/Northwest's profits, and he would have had the right to vote on such matters as amendment of the Code of Regulations, approval of corporate contracts, admission of new shareholders, termination of shareholder's interests, approval of draws, shares of net profits, and dissolution of the corporation.

In his deposition of June 22, 1992, Dr. Reddy discussed the invitations to join AA/Northwest. He also testified that he was offered a position as an equal shareholder, stating, in pertinent part:

Q: And you were invited to join that group [AA/Northwest], were you not?

A: Yes.

Q: And you were invited to join that group as a shareholder?

A: Yes.

Q: As an equal shareholder?

A: Yes.

Q: And you were invited to join that groups as an equal shareholder with all of the same rights and privileges as the other shareholders?

A: Yes.

Q: And you were going to be compensated in the same fashion as the other shareholders?

A: That's fair enough.

 \* \* \* \* \* \*

Q: Well, let me phrase it differently. You were offered, as you indicated, the opportunity to join AAND on the same basis as everybody else and you never accepted that offer, did you?

A: I was negotiating because my situation was very different than the members of the AAND or AAOD.

Q: Doctor, my question is you never accepted offer to join AAND on the same terms as everybody else, did you?

A: Not on the same terms which were offered.

(B.K. Reddy 1992 Dep. at 184–87) By this testimony, Plaintiff has acknowledged that he was offered a position as a shareholder of AA/Northwest, with the same rights and compensation as the other shareholders. Moreover, he has not provided any evidence to contradict Dr. Jenkins' statements that shareholder status included significant management control and a share of corporate profits. The uncontroverted evidence therefore indicates that Reddy was offered a position as a shareholder of AA/Northwest. Accordingly, there is no genuine issue of material fact that he was offered a position as a shareholder for purposes of Chapter 4112.

However, Plaintiff has also provided a copy of the proposed employment agreement between himself and AA/Northwest, dated June 27, 1990. (Pl.'s Appendix to Mem. in Opp. to Summ. J., Ex. 17).[39] According to that document, Reddy would have received an annualized gross salary of $156,000, although the amount was subject to adjustment by the AA/Northwest Board of Directors in order to reflect Reddy's productivity or AA/Northwest's overall financial situation. In addition, Plaintiff was to receive supplemental compensation, which would reflect the reasonable value of his services as determined by the Board of Directors. The employment agreement also contained provisions for vacation, insurance and fringe benefits, parental leave, death and disability insurance, peer review procedures, termination, and termination benefits. The document makes no mention of share purchase or voting rights, nor does it contain any other indicia of ownership. Based on a review of the proposed employment agreement, it appears that Dr. Reddy was offered a position as an employee, in addition to one as a shareholder. Accordingly, Plaintiff has provided evidence that AA/Northwest is a proper defendant under Chapter 4112. AA/Northwest's Motion for Summary Judgment is OVERRULED, to the extent that it asserts that Plaintiff was not an "employee" for purposes of Chapter 4112.

---

39. A virtually identical proposed employment agreement, dated May of 1990, was included in Plaintiff's exhibits for the preliminary injunction hearing (Ex. 16). That agreement did not contain the amount of the annualized gross salary and the monthly installments.

### 2. *Employer Liability Under Title VII*

As to liability of a professional corporation under Title VII for acts against its shareholders, the federal courts of appeals do not have a unified approach. The Second Circuit has taken a position similar to that in *Cruz, supra,* stating that a corporate employee of a professional corporation, incorporated for the purpose of providing medical services, was covered by the ADEA, and that no inquiry into whether the physician held a position similar to a partner in a partnership was necessary. *Hyland v. New Haven Radiology Assoc., P.C.,* 794 F.2d 793, 798 (2d Cir.1986) (radiologist who was officer, director and shareholder of professional corporation was covered by ADEA when he had an employment agreement which detailed terms and conditions of employment). Other circuits have disregarded the corporate form, and have evaluated whether the shareholder in a professional corporation has, considering the "economic realities," a status similar to that of a partner in a partnership. *E.g., EEOC v. Dowd & Dowd,* 736 F.2d 1177 (7th Cir.1984); *Fountain v. Metcalf, Zima, & Co.,* 925 F.2d 1398, 1400–01 (11th Cir.1991) (In determining whether a member/shareholder of a professional corporation constituted a "partner" or "employee", the court should rely not on any label, "but on the actual role played by the claimant in the operations of the involved entity and the extent to which that role dealt with traditional concepts of management, control, and ownership."); *Devine v. Stone, Leyton & Gershman, P.C.,* 100 F.3d 78 (8th Cir.1996) (shareholders of professional corporations were owners where they participated in all management decisions), *cert. denied,* 520 U.S. 1211, 117 S.Ct. 1694, 137 L.Ed.2d 821 (1997).[40]

Although the Sixth Circuit has not squarely addressed which test is appropriate to determine whether a shareholder in a professional corporation may be an employee under Title VII, it has applied the "economic realities" test to determine whether an individual is an employee under Title VII in other contexts. *Armbruster v. Quinn,* 711 F.2d 1332 (6th Cir.1983) (using "economic realities" test to determine whether independent contractors would be covered by Title VII); *Lilley v. BTM Corp.,* 958 F.2d 746, 750 (6th Cir.), *cert. denied,* 506 U.S. 940, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992); *Simpson v. Ernst & Young,* 100 F.3d 436, 442 (6th Cir.1996) (using *Darden* test to determine whether individual was employer or partner of accounting firm).[41] In light of the fact that the Sixth Circuit has applied the economic realities test to evaluate employment status under Title VII and that other circuits have rejected *Hyland* and performed a similar analysis, this Court will also apply that means of analysis. Accordingly, for purposes of Title VII, this Court must determine from of the evidence before it

---

**40.** Historically, the Third Circuit applied a hybrid approach, using both the "economic realities" test and the "right to control" test. *EEOC v. Zippo Mfg. Co.,* 713 F.2d 32, 38 (3d Cir.1983). Recent cases, however, have applied the common law agency doctrine, as set forth by the Supreme Court in endorsed in *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)(ERISA case).

**41.** Relying on *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)(ERISA case), the Sixth Circuit recently stated that common law principles of agency should govern whether an employer-employee relationship exists in the context of a lawsuit under Title I of the Americans with Disabilities Act. *Johnson v. City of Saline,* 151 F.3d 564 (6th Cir.1998). However, it has noted that there is little difference between the *Darden* test and the economic realities test. *Simpson v. Ernst & Young,* 100 F.3d 436, 442 (6th Cir.1996); *Eyerman v. Mary Kay Cosmetics, Inc.,* 967 F.2d 213 (6th Cir.1992).

whether a genuine issue of material fact exists as to whether Plaintiff was offered a position as an employee of AA/Northwest by looking beyond the labels "shareholder" and "employee" and analyzing the actual proposed relationship between those parties. As discussed above with regard to employer status under Chapter 4112, the uncontroverted evidence therefore indicates that Reddy was offered a position as a shareholder of AA/Northwest with the same rights and compensation as the other shareholders. Moreover, he has not provided any evidence to contradict Dr. Jenkins' statements that shareholder status included significant management control and a share of corporate profits. Accordingly, there is no genuine issue of material fact that he was offered a position as a shareholder, rather than as an employee, of AA/Northwest, for purposes of Title VII.

Plaintiff has argued that AA/Northwest may be held liable under Title VII, regardless of shareholder status, because that statute prohibits discrimination against "any individual." [42] Based on this language and the Sixth Circuit's decision in *Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870 (6th Cir.1991), Reddy asserts that Title VII protects persons whose equal employment opportunities were denied by prohibited discrimination or retaliation. In *Christopher*, a nurse filed an action under Title VII against a hospital, challenging the hospital's refusal to grant her limited privileges that would allow her to work as a private duty nurse. The hospital had contended that the court lacked jurisdiction to hear the case, because the plaintiff was neither an employee nor an applicant for employment of the hospital. The Sixth Circuit rejected the hospital's contention, stating that "Stouder's control of Christopher's ability to practice as a private scrub nurse sufficiently impacted her employment opportunities to bring her claims within the intended scope of § 2000e–3." 936 F.2d at 874. The Sixth Circuit relied heavily on the D.C. Circuit's decision in *Sibley Mem. Hosp. v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973),[43] stating:

In its *Sibley Mem. Hosp.* opinion, the court began by pointing out that "The Supreme Court has said that the Congressional objective in Title VII is 'plain from the language of the statute,' and that it is 'to achieve equality of employment opportunities[.]'" The court then reasoned that in certain circumstances control over access to employment may reside in organizations outside the regular employer-employee relationship. The court found it significant that Title VII explicitly applies to organizations such as unions or employment agencies "which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties." From these premises, the court reasoned:

---

**42.** Plaintiff similarly argues that the statutory language of Ohio Rev.Code § 4112.99 prohibits discrimination against "any person." Because the Court has already determined that AA/Northwest is a proper defendant under Chapter 4112, it need not address this argument.

**43.** As summarized by the *Christopher* court, "*Sibley Mem. Hosp.* concerned a sex discrimination claim under Title VII by a private duty nurse against a hospital. The basis of the plaintiff's claim was that the hospital's Nurs-

ing Office would not refer the nurse, who was a male, to female patients who requested a private duty nurse. This action by the hospital was in contravention of its own policy of referring patients to the next available private nurse in its register. The defendant hospital moved to dismiss on the ground that the plaintiff was not in an employer-employee relationship with the hospital and therefore the court did not have jurisdiction to hear the claim. However, the district court found that the plaintiff stated a claim under Title VII and the D.C. Circuit affirmed." 936 F.2d at 875.

To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited. The court went on to determine that the hospital, while not the plaintiff's employer, was in the same position to interfere with the plaintiff's employment opportunities as unions or employment agencies, and therefore, "neither the spirit nor, more essentially, the language of the Act" prohibited the plaintiff from proceeding against the defendant hospital.

The facts of the instant case are directly analogous to the situation in *Sibley Mem. Hosp.* Like the nurse in *Sibley*, Christopher cannot pursue her employment opportunity of working as a private scrub nurse if Stouder does not grant her limited privileges. If Stouder denies those privileges to Christopher on impermissible grounds, it is, in effect, denying her employment on impermissible grounds, despite the fact that it does not pay her salary. *Christopher*, 936 F.2d at 874–75. Thus, analogizing the hospital's interference with Christopher's employment as a private duty scrub nurse with interference by a union or employment agency, the court declared that "a plaintiff alleging interference by a defendant in the plaintiff's employment with third parties *ipso facto* states a claim under either § 2000e–2 or § 2000e–3." *Id.* at 876. Thus, the court held that the hospital was an employer, within the meaning of Title VII, with respect to the plaintiff-nurse.

AA/Northwest's position relative to Plaintiff is not analogous to the hospital's position relative to the nurse in *Christopher*. The failure of the hospital in *Christopher* to grant privileges effectively prevented the nurse from performing as a nurse for a third party. Although AA/Northwest's failure to reach an agreement with Reddy would have the effect of precluding him from practicing at Good Samaritan, there is no evidence that AA/Northwest had significant power to interfere with Reddy's ability to enter into a direct employment relationship with a third party employer. Unlike the hospital, AA/Northwest's role relative to Reddy's employment cannot be said to be analogous to a union or an employment agency. At best, Reddy's dispute with AA/Northwest most closely resembles one between a prospective employee and a prospective employer. The Court concludes that the approach set forth in *Christopher* for attaching liability to those entities who interfere with an individual's employment opportunities is inapplicable to the present circumstances. Plaintiff, therefore, has failed to created a genuine issue of material fact on whether AA/Northwest is an employer within the meaning of Title VII. Because AA/Northwest is not an employer under that statute, it is entitled to summary judgment on Plaintiff's Title VII claims.

### 3. *Reddy's Discrimination and Retaliation Claims*

As an alternative argument, assuming that Reddy is an employee who can pursue his discrimination/ retaliation claims, AA/Northwest asserts that Reddy cannot establish either discrimination or retaliation by it.[44] It argues that both before and

44. Because Plaintiff has not created a genuine issue of material fact that AA/Northwest is an employer under Title VII, Defendant's alternative argument is applicable only to the claims under Ohio Rev.Code § 4112.99.

after Plaintiff filed his charge of discrimination, he was offered a contract which was identical to the ones offered to and accepted by its other shareholders. It also points to the cultural diversity of its membership to indicate the implausibility of Reddy's claim. AA/Northwest further asserts that its withdrawal of its settlement offer, which presented Reddy with the opportunity to enter into a contract with it on terms more favorable than those offered to others, cannot constitute retaliation.

▮ Plaintiff has failed to establish his claims of discrimination and retaliation under Chapter 4112. On May 3, 1990, Mr. Deck sent correspondence to the anesthesiologists practicing at Good Samaritan, informing them that the hospital had entered into an exclusive contract with AA/Northwest and that unless they reached an agreement with that entity, their ability to provide anesthesia services at Good Samaritan would cease as of 12:01 a.m. (EDT) on May 26, 1990. AA/Northwest has repeatedly argued that Plaintiff was offered a position with it on the same terms as the other anesthesiologists, including the same rights and privileges of ownership. In his testimony quoted above, Reddy acknowledged that this was so. (B.K. Reddy 1992 Dep. at 184–87; *see supra* p. 49–50). He testified that he did not accept those terms, because he felt that he had different circumstances than the other anesthesiologists (*id.*), presumably due to his independent practice. There is no evidence that AA/Northwest refused to contract with Reddy or that it attempted to contract with him on different, discriminatory terms than those offered to others. Accordingly, Plaintiff has failed to establish that AA/Northwest discriminated against him by denying him a contract to provide anesthesia services.

As for the allegation that AA/Northwest discriminated against him by denying him a leadership position in the group, the undisputed evidence establishes that membership in AA/Northwest is a prerequisite for the position of Medical Director. Because Plaintiff did not become a member of AA/Northwest, he was not qualified for the position of Medical Director. AA/Northwest is entitled to summary judgment on these claims.

Plaintiff further claims that AA/Northwest retaliated against him by withdrawing advantageous terms of employment from him and by refusing to employ him. This claim is based upon his allegations that AA/Northwest had extended him an opportunity to join it, with a deadline of Friday, June 29, 1990, and revoked the offer. According to Reddy, he spoke with Dr. Alfred Jenkins on Monday, June 25, 1990, at which time Dr. Jenkins asked him if he would join AA/Northwest by Wednesday, June 27th (Reddy June 22, 1992 Dep. at 193).[45] Reddy requested an extension of that deadline until June 29th, to which Jenkins had agreed (*id.* at 195). During the morning of the 29th of June, Plaintiff contacted David Ackley, AA/Northwest's Officer Manager, and asked Ackley to come to his office on Salem Avenue that afternoon to look at his office furniture and to bring the contract between AA/Northwest and him (*id.* at 205–6). When Mr. Ackley did not come to Reddy's office, Plaintiff's secretary contacted him. Mr. Ackley indicated that he was busy with a couple of insurance agents and would come later. Later that day, Plaintiff's secretary again telephoned Mr. Ackley, who stated that he was busy and that he would bring the contract on Monday (Reddy 1992 Dep. at 210). When Reddy spoke with Dr. Jenkins on Monday, July 2, 1990, he was

---

45. Parenthetically, this Court issued its ruling denying Plaintiff's Motion for a Preliminary Injunction on the previous Thursday, June 21, 1990 (*See* Doc. # 11).

informed that the time available for signing the contract had expired on Friday. When Reddy telephoned Dr. Ralston that same day he was told "we shut the doors on you." (*Id.* at 224) Plaintiff spoke with Dr. Jenkins in person on Tuesday, July 3, 1990. During that conversation, he was told that AA/Northwest had made a decision on the previous Friday not to take him as a member (*id.* at 229). Based on this conduct, Plaintiff alleges that AA/Northwest's offer was withdrawn, because he filed charges of discrimination and participated in proceedings under Title VII and Chapter 4112.

At the outset, the Court notes that the charges of discrimination and retaliation with the Ohio Civil Rights Commission and this litigation were initially directly solely at Good Samaritan.[46] The anesthesiologists at Good Samaritan were initially fact witnesses for this litigation, not defendants. At the time this Court issued its ruling on Plaintiff's Motion for a Preliminary Injunction, the hospital remained the only defendant in this action. Moreover, Good Samaritan was the only defendant on June 29th and July 2, 1990, when AA/Northwest refused to provide Reddy with a contract to join that group. Plaintiff first sought to include AA/Northwest as a Defendant to this litigation on July 24, 1990, when he filed a motion to amend his complaint (Doc. # 15), three weeks after AA/Northwest refused to provide him with an employment contract. In addition, Plaintiff filed his Amended Charge of Discrimination with the Ohio Civil Rights

Commission on August 29, 1990, two months after the alleged retaliatory conduct (*see* Doc. # 30). Accordingly, this Court must analyze whether Plaintiff has supported a claim that AA/Northwest retaliated against him by refusing him a contract of employment due to Plaintiff having filed charges of discrimination and pursued litigation against Good Samaritan. *See Felts v. Campbell,* 134 F.3d 371, 1998 WL 13403 (6th Cir.1998) (plaintiff alleged that government agency refused to hire her due to her past charges of discrimination while employed with another agency).

It is undisputed that Plaintiff engaged in a protected activity. He filed charges of discrimination against Good Samaritan with the Ohio Civil Rights Commission and proceeded to pursue litigation of those charges in this Court. It is clear that his conduct was known to AA/Northwest. A number of principals of that corporation, including Dr. Alfred Jenkins, testified during the preliminary injunction hearing in June, 1990.

As for the third element of a retaliation claim, Plaintiff has· provided evidence AA/Northwest has taken an adverse employment action, to wit: AA/Northwest refused to provide him with a contract for employment on July 2, 1990, even though he requested a copy of the contract on the morning of June 29, 1990, *i.e.,* prior to the deadline for acceptance. Plaintiff's evidence indicates that AA/Northwest refused him employment with and an ownership interest in that corporation. Defendant

---

**46.** As discussed, *supra,* Reddy's other complaints of discrimination occurred in 1985 and 1988, prior to the existence of AA/Northwest. However, Plaintiff does not appear to rely on those complaints as the basis for AA/Northwest's alleged retaliation. In his memorandum, Plaintiff states: "The timing is a matter of days. Dr. Jenkins testified at the preliminary injunction hearing." (Doc. # 125 at 208) Accordingly, Plaintiff's retaliation claim appears to be based on his filing of a charge with the Ohio Civil Rights Commission and this litigation. Even if Plaintiff were relying on those earlier complaints, due to the two-year lapse between the time of those complaints and the alleged refusal of AA/Northwest to contract with him, the evidence does not support a reasonable inference of causation.

asserts that the offer of employment, which was revoked on June 29, 1990, was merely a settlement offer, which could be freely revoked. This Court does not agree with Defendant's characterization. As noted above, at the time AA/Northwest revoked its offer, there were no claims pending against it. Plaintiff had neither filed a charge of discrimination with the Ohio Civil Rights Commission, nor was the corporation a defendant in this litigation. In addition, AA/Northwest has not cited to any evidence that the offers of employment/ ownership were intended to settle any claims. Accordingly, Defendant's argument is without merit.

Plaintiff's retaliation claim against AA/Northwest fails, however, because the evidence does not support an inference that the revocation of the offer was a consequence of Reddy's filing charges of discrimination and retaliation and of his pursuit of judicial proceedings based thereon. Although the circumstances of Plaintiff's failure to sign the contract on June 29, 1990, reasonably suggest animosity between Reddy and members of AA/Northwest, there is no evidence that the animus was due to Plaintiff having engaged in protected activities against Good Samaritan. In his memorandum, Plaintiff states merely that Dr. Jenkins had a personal animus toward him "due to his perception that Dr. Reddy had excluded him from obstetrical anesthesiology and curried favor with surgeons by handling cases Dr. Jenkins had refused." (Doc. # 125 at 208) He further states that Dr. Jenkins shared Deck's views on FMGs, and that Dr. Jenkins would not want Plaintiff to be Medical Director due to their past relationship and his present distrust of him (*id.*). None of these arguments support, in any way, Plaintiff's claim that he was retaliated against due to the fact that he had engaged in protected activities with Good Samaritan.

Moreover, according to the correspondence between counsel that was submitted by Plaintiff, Reddy and AA/Northwest continued to negotiate Reddy's employment with/ownership in the corporation prior to and following the filing of charges of discrimination against Good Samaritan and his Motion for a Temporary Restraining Order. Specifically, it notes that after this Court overruled Plaintiff's request for a preliminary injunction, AA/Northwest asked him for a decision as to whether he would join the group by Monday, June 25, 1990. That deadline was extended until the following Wednesday and, according to Plaintiff, it was again extended to Friday, June 29, 1990. Although the evidence clearly demonstrates that Good Samaritan instructed AA/Northwest to offer positions to all of the anesthesiologists on staff, there is no evidence to suggest that the group had to continue negotiating with Plaintiff (or any other anesthesiologist) indefinitely. Yet, even after this Court dissolved the temporary restraining order, AA/Northwest offered Plaintiff the opportunity to join it and allowed him to extend the deadline for his reply numerous times. Based on this uncontroverted evidence, Plaintiff has not created a genuine issue of material fact that AA/Northwest's revocation of their offer of employment was causally connected to his protected activities with regard to Good Samaritan. Accordingly, AA/Northwest is entitled to summary judgment on Plaintiff's retaliation claim.

### C. *Good Samaritan*

Reddy alleges that Good Samaritan retaliated against him in a multitude of ways, to wit: 1) by the improper application of rules, 2) by denying him rights guaranteed by Good Samaritan's bylaws, 3) by denying him referral and physician/patient relationships, 4) by withdrawing advantageous terms of employment

from him and refusing to employ him, 5) by denying him a contract to provide anesthesia services at the hospital, and 6) by denying him a leadership position in a group to provide anesthesia services. Good Samaritan argues that it is entitled to summary judgment on these claims because the Plaintiff's public opposition to discrimination was, as a matter of law, too remote in time from the adverse employment action to establish a *prima facie* case of retaliation. Good Samaritan also argues that there is no evidence that it was aware of Plaintiff's opposition to discrimination, and that it did not subject the Plaintiff to an adverse employment decision.

Construing the evidence in the light most favorable to Plaintiff, he has not created a genuine issue of material fact that Good Samaritan's conduct in entering into the exclusive contract was causally connected to his prior complaints of discrimination.[47] The protected activity (i.e., incidents in which he opposed discrimination) upon which Plaintiff relies for his retaliation claim occurred in 1984 and 1988.[48] The allegedly retaliatory restrictive rules were imposed approximately four years after Plaintiff opposed Dr. Richard Jenkins' crusade against the number of FMGs in the anesthesiology department at Good Samaritan. In addition, at least five years passed before Good Samaritan entered into the exclusive contract with AA/Northwest and a person other than Plaintiff was selected as Medical Director of that group. Due to the extended lapse in time between the protected activity and the alleged adverse employment action, and in the absence of any other evidence that the protected activity caused the retaliation, Plaintiff cannot establish a *prima facie* case of retaliation based upon his opposition to discrimination in 1984.

The 1988 incident was a meeting which occurred in September of that year between the Plaintiff and two other doctors at Good Samaritan (Drs. Campbell and Harmon). The purpose of the meeting was to discuss and possibly to impose a penalty on the Plaintiff for asserted violations of the new restrictive rules regarding the practice of anesthesiology at Good Samaritan by Plaintiff.[49] Plaintiff was busy and unsuccessfully attempted to postpone (or cancel) that meeting. During that meeting, Plaintiff opposed discrimination by stating to Drs. Campbell and Hammond that if he were a white American physician, rather than an FMG, he would not have been required to attend the harassing meeting or threatened with discipline for violating the rules.[50] Assuming for the sake of argument that this opposition to discrimination was temporally close enough to the decision to grant the exclusive contract to AA/Northwest, Plaintiff's employment was not adversely affected by the exclusive contract. He was given the same opportunity to participate in the corporation as the other anesthesiologists. He declined to do so. In addition, the 1988 meeting cannot constitute a basis for

---

**47.** Items (2) through (6) of the conduct complained of by Plaintiff stem from Good Samaritan's decision to enter into an exclusive contract with AA/Northwest.

**48.** Plaintiff alleges that he filed a charge of discrimination on May 23, 1990. Quite simply, Plaintiff does not have a valid claim that he was retaliated against because he filed this charge of discrimination. The decision to enter into the exclusive contract with AA/Northwest was made before the Plaintiff filed his charge of discrimination.

**49.** Since the new restrictive rules had already been adopted when this incident occurred, the Plaintiff cannot claim that Good Samaritan retaliated against him by adopting restrictive rules. Retaliation cannot occur prior to the protected activity.

**50.** The outcome of the September, 1988, meeting was that Plaintiff was not disciplined.

a retaliation claim based on the improper application of rules. The individuals to which Plaintiff complained were not members of Good Samaritan's administration. Plaintiff has not provided evidence that Good Samaritan was aware that he opposed discrimination during that meeting.

As for the failure to employ him as Medical Director, Plaintiff has provided evidence that Good Samaritan initially desired that Dr. Thomas hold that position. However, Dr. Thomas resigned from Good Samaritan prior to the formation of AA/Northwest, and never held that position. As stated repeatedly in this Decision, the undisputed evidence indicates that, accordingly to the exclusive contract between Good Samaritan and AA/Northwest, AA/Northwest, not the hospital, nominated an individual for the position of Medical Director. Accordingly, there is no evidence to support that Good Samaritan engaged in an adverse employment action when it failed to hire him as Medical Director. Moreover, as discussed above, a prerequisite for the position is that the individual be a member of AA/Northwest. Plaintiff, through no fault of Good Samaritan, failed to become a member of the group. Because Plaintiff never joined AA/Northwest, he has not provided any evidence that he was qualified for the position of Medical Director and that Good Samaritan refused to employ him. Accordingly, Good Samaritan is entitled to summary judgment on Plaintiff's retaliation claims.

In summary, the Court concludes that Defendants are entitled to summary judgment on each of the claims set forth against them. Based upon the foregoing, the Court directs that judgment be entered in favor of the Defendants and against the Plaintiff, dismissing this case with prejudice.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.